# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

DON'TE LAMONT McDANIEL,
Defendant and Appellant.

S171393

Los Angeles County Superior Court
No. TA074274-01

---

August 26, 2021

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Cuéllar, Kruger, Groban, and Jenkins concurred.

Justice Liu filed a concurring opinion.

---

PEOPLE v. McDANIEL

S171393

Opinion of the Court by Liu, J.

Defendant Don'te Lamont McDaniel was convicted of two counts of first degree murder for the shootings of Annette Anderson and George Brooks, two counts of attempted murder for the shootings of Janice Williams and Debra Johnson, and possession of a firearm by a felon. (Pen. Code, §§ 187, subd. (a), 664 & 187, subd. (a), former 12021, subd. (a)(1); all undesignated statutory references are to the Penal Code.) The jury found true the special circumstance of multiple murder. (§ 190.2, subd. (a)(3).) The jury also found true the allegations of intentional discharge and use of a firearm, intentional discharge resulting in great bodily injury and death, and commission of the offense for the benefit of, at the direction of, and in association with a criminal street gang. (§§ 12022.53, subd. (d), 122022.53, subds. (d) & (e)(1), 186.22, subd. (b)(l).) After the first penalty phase jury deadlocked, a second jury delivered a verdict of death on December 22, 2008. This appeal is automatic. (§ 1239, subd. (b).) We affirm.

## I. FACTS

### A. Guilt Phase

#### 1. Prosecution Case

The events occurred in and around Nickerson Gardens, a large public housing complex in Southeast Los Angeles. In 2004, the Bounty Hunter Bloods gang was active in Nickerson Gardens, with about 600 members registered in law

1

enforcement databases. McDaniel and Kai Harris were members of the Bounty Hunter Bloods, as was one of the victims, Brooks.

On April 6, 2004, at 3:30 a.m., officers responded to reports of gunshots at Anderson's apartment in Nickerson Gardens. Entering through the back door, they observed the bodies of Anderson and Williams. Williams appeared to be alive. Brooks's body was slumped against the refrigerator. In the living room, an officer observed Johnson, who had a gunshot wound to the mouth and was trying to stand up.

Anderson died at the scene from multiple gunshot wounds. Stippling indicated that the wound to her face was inflicted at close range. Cocaine and alcohol were present in Anderson's body at the time of her death. Brooks also died at the scene from multiple gunshot wounds; he suffered five wounds to the face, and stippling indicated they were fired at close range. Williams survived gunshot wounds to her mouth, arms, and legs, and she spent three to four months in the hospital. Johnson also survived gunshots to the face and chest and underwent multiple surgeries.

Physical evidence collected at the scene included ten nine-millimeter and six Winchester .357 magnum cartridge cases. Investigators found one nine-millimeter cartridge case on Brooks's stomach and two .357 magnum cartridge cases on his neck. Two nine-millimeter cartridge cases were found near Anderson's hands. Investigators also recovered drug paraphernalia, including a metal wire commonly used with a crack pipe near Anderson's hand, a glass vial containing a crystal-like substance, and a plastic bag containing a rock-like substance in Brooks's pants.

Five days later, during a traffic stop, Deputy Sheriff Marcus Turner recovered a loaded Ruger nine-millimeter gun and associated ammunition from McDaniel. McDaniel identified himself as Mitchell Reed. About one month later, Officer Freddie Piro arrested a member of the Black P-Stone gang in Baldwin Hills, an area 13 miles away from Nickerson Gardens. During the arrest, Officer Piro recovered a .375 magnum Desert Eagle handgun.

Ten of the cartridges recovered from the scene matched the nine-millimeter Ruger recovered from McDaniel. Six of the cartridges found at the scene matched the .357 magnum Desert Eagle. The examiner also analyzed projectile evidence recovered at the scene and concluded that none was fired by the nine-millimeter gun. The source of other ballistics evidence was inconclusive.

In addition to this physical evidence, the prosecution introduced testimony from the survivors of the shooting and other witnesses who placed McDaniel and Harris at or near the crime scene. The defense case consisted primarily of exploiting inconsistencies in these witnesses' statements and the fact that many of the witnesses were intoxicated at the time of the shooting.

Williams testified that she was sitting at the table with Anderson on the evening of the shooting. Williams heard a whistle and then a knock on the back door. Elois Garner was at the backdoor and identified herself. Anderson opened the door, and Williams saw McDaniel enter the apartment shooting. After Williams was shot, she fell on the floor and lost consciousness. Williams had known McDaniel for about 10 years.

Although Williams had a history of drug use, she denied using drugs that night, but she testified that she had been drinking. She did not see Anderson or Brooks doing cocaine, nor did she see any other drug paraphernalia in the apartment. Williams did not realize that Johnson was in the living room and thought Johnson was in jail at the time. At the preliminary hearing, Williams testified that she had "nodded off" immediately before the shooting. When confronted with this prior testimony, she admitted to being "in and out" that night and that her head was down on the table at the time of the knock on the back door. Williams first identified McDaniel as the shooter on April 12, 2004, when officers showed her a six-pack photo lineup in the hospital.

Johnson died of unrelated causes before trial, so the prosecutor read her testimony from the preliminary hearing. At 3:00 a.m. on April 6, 2004, Johnson was sleeping on the living room floor at Anderson's home. She awoke to the sound of multiple gunshots coming from the kitchen. Johnson saw McDaniel enter through the back door then exit the kitchen and head toward the hallway. She looked up and saw McDaniel in dark clothes standing over her. He shot her and then crouched down and moved toward the front door. She heard two male voices during the shooting, neither of which was Brooks's. McDaniel was the only person she saw in the living room.

When Detective Mark Hahn interviewed Johnson at the hospital on April 9, 2004, she initially said she did not see the shooter because she was asleep when she was shot. During the preliminary hearing, she explained that she did not identify McDaniel because she was afraid. On April 12, the detectives showed her a six-pack photo lineup. Johnson circled McDaniel's photograph but did not tell the police his name; instead, she

wrote "shorter black boy." The court attempted to clarify whom she was comparing McDaniel to since she only saw one shooter in the house. She explained that Williams had told her at the hospital a second man was involved: "a tall, light-skinned dude at the backdoor."

The prosecution also introduced testimony from various witnesses recounting the events immediately before and after the shooting. On the night leading up to the shooting, Derrick Dillard was with Brooks at Anderson's apartment in Nickerson Gardens. Dillard and Brooks left Anderson's apartment to go to Harris's house a half-block away. After 15 minutes, they left to return to Anderson's apartment. On the way, Brooks, Harris, and Dillard ran into McDaniel. Brooks and McDaniel spoke briefly, and McDaniel asked Brooks "where have he been" and said that "Billy Pooh's looking for him." Detective Kenneth Schmidt testified that William Carey went by the name "Billy Pooh."

Dillard and Brooks proceeded to Anderson's house along with Prentice Mills. They went into Anderson's bedroom and used cocaine. Dillard testified that Anderson called out that someone was at the door for Brooks, and Brooks left the room. Dillard heard the back door open, followed by female screams and gunshots. After the gunshots stopped, Dillard did not hear anything and remained under the bed. After 10 minutes, he and Prentice left the room. Prentice left the house. Dillard called 911 and then left.

That night, Garner was drinking Olde English and walking in the vicinity of Anderson's apartment. She was approached by McDaniel and someone named "Taco," whom she later identified as Harris. She had seen both men before in the

neighborhood.  McDaniel put a gun to her head and ordered her to knock on Anderson's back door.  Both men were wearing black.

Garner's testimony diverged from the testimony of Dillard, Williams, and Johnson in several respects.  Garner testified that she knocked at the back door but did not say anything.  After knocking, she ran to a nearby parking lot. About five minutes later, she heard two gunshots and then two more, which conflicted with other witnesses' testimony that they heard immediate gunfire.  She saw McDaniel and Harris run out of the back of Anderson's apartment toward the gym.  After the shooting had ended, she returned to the apartment and looked inside.  She saw Anderson on the ground.

During her first interview on April 15, 2004, Garner said she had heard the shots, but she did not identify the shooters or tell the police about knocking on Anderson's door.  During an interview on May 26, she identified McDaniel and Harris, and she told police that McDaniel had held a gun to her head.

Angel Hill was Harris's girlfriend and lived with him at Dollie Sims's house a half-block away from Anderson's apartment.  On April 6, Hill saw McDaniel and Harris sitting on Sims's porch.  Hill left the house and went to a nearby parking lot.  She heard gunshots.  She was supposed to pick up Dillard from Anderson's apartment, so she got in her car and drove over. No one came to the back door when she knocked.  After that, she returned to Sims's house where she saw McDaniel and Harris smoking on the porch.  Hill, Harris, and McDaniel then went to the home of Tiffany Hawes, McDaniel's girlfriend.

Hill testified that at Hawes's home, McDaniel was "bragging about" the shooting like it was "a big joke."  They

watched a news report about the shooting, and McDaniel explained what had happened in Anderson's apartment. He said to Harris, "You disappointed me, man." At some point, Carey arrived. McDaniel and Carey discussed what had happened, and McDaniel again bragged about the shooting.

The defense emphasized that Hill had provided conflicting testimony throughout the investigation. While Harris was in jail awaiting trial, he asked Hill to tell the police he had never left the house that night. Hill wrote Harris a letter saying she would do anything for him. In her first police interview on April 13, 2004, Hill said she was home with Harris the entire night. She was using PCP, crystal meth, cocaine, marijuana, and liquor on the night before the shooting.

Shirley Richardson also lived in Sims's house. Richardson testified that on the night of the shooting, she, Hill, and Harris were home getting high on PCP, crystal meth, and cocaine. McDaniel came over that night wearing black. He had a long gun and asked Harris to leave the house with him. Harris did not want to leave but eventually left. Richardson saw Harris with a Desert Eagle handgun that night. A few minutes after Harris left, Richardson heard gunshots. When McDaniel and Harris returned to Sims's house, Harris appeared upset.

On the night of the shootings, Sims returned home from work at 12:30 a.m. and saw Harris, Hill, Richardson, and Kathryn Washington in Harris's bedroom. Sims fell asleep for about 30 minutes and awoke to McDaniel banging on her back door and asking for Harris. Harris told her not to open the door and to go back to her room. From inside her room, she heard McDaniel tell Harris that someone in the projects had been robbing the places where he "hustled," and he wanted Harris to

help him "to go handle this." Fifteen minutes after McDaniel, Harris, Richardson, Hill, and Washington left the house, Sims heard gunshots. Ten minutes after the gunshots, Hill, Richardson, and Washington returned to the house. Five minutes later, Harris returned. When McDaniel returned, he talked about buying tickets for all of them to go to Atlanta, saying, "We can all take this trip and stuff and everything be cool. Just everything, keep it under the rock and we keep pushing."

On the morning of April 6, 2004, McDaniel asked Hawes to pick him up near 112th Street and Compton Avenue. She picked him up first, then picked up Harris and Hill at Sims's house. They went back to her house where they watched news coverage of the shooting. Contrary to Hill's testimony, Hawes testified that McDaniel did not say anything while watching the news and that she did not see Billy Pooh at her house that night.

When police searched Hawes's house in December 2004, they found a newspaper article about the shooting at Anderson's apartment and an obituary for William Carey (Billy Pooh), who was killed sometime after the shooting. The police also found bus tickets to Atlanta in Mitchell Reed's name.

Myesha Hall lived three doors down from Anderson in a second-story Nickerson Gardens apartment. Around 3:00 a.m. on April 6, 2004, she was standing at her window when she heard four single gunshots. She saw a short Black man wearing a white T-shirt run out of the back door of Anderson's apartment. After that, she heard "a lot of shots, like automatic." She then saw two tall Black men wearing dark-colored clothes run out of Anderson's back door. She did not hear any more gunshots after that.

## 2. *Defense Case*

The defense presented one witness, Dr. Ronald Markman, a psychiatrist familiar with the effects of PCP, methamphetamine, cocaine, marijuana, and alcohol. He testified to the effects of each drug on perception when used individually and the effects when used together. The "slowing" or "depressant qualities" of marijuana could possibly be neutralized by the stimulating effect of methamphetamine or cocaine. The symptoms that are common to the drugs would be accentuated when those drugs are taken together.

## B. Penalty Phase

### 1. *Prosecution Case*

After the first jury hung in the penalty phase, the prosecutor presented the guilt phase evidence described above concerning the circumstances of the capital offense. The remainder of the prosecution's case focused on McDaniel's prior bad acts (section 190.3, factors (b), (c)) and victim impact evidence (section 190.3, factor (a)).

### a. *Prior Bad Acts*

A little after midnight on April 6, 1995, Javier Guerrero's car broke down on the 105 freeway. He was given a ride to a payphone at 112th Street and Central Street in Los Angeles. While he was calling his family, three men approached him. One put a gun to his head. All three demanded money. The three men searched him, took his watch, then ran away. Guerrero identified a suspect that night in a field lineup but did not see that suspect in the courtroom. That night, Officer Hill saw the robbery and apprehended one of the participants, whom he identified as McDaniel.

On February 29, 1996, Thomas Tolliver was working as a campus security aide at Markman Middle School. At noon, Tolliver encountered McDaniel and two other individuals on the campus. Tolliver asked them to leave. McDaniel asked Tolliver if he was strapped. Tolliver again told McDaniel to leave. McDaniel said, "I'm going to come back and shoot your mother fucking ass." The three individuals then ran away.

On December 8, 2001, Officer Shear saw McDaniel and tried to detain him. As McDaniel ran away, Shear noticed a large stainless steel handgun in McDaniel's waistband. McDaniel fled into the upstairs bedroom of a nearby apartment. Shear obtained consent to search the apartment. McDaniel came outside and was handcuffed. Inside the upstairs bedroom, officers found a .357-caliber handgun containing five hollow point bullets.

On January 18, 2002, Officer Moreno was on patrol near Nickerson Gardens. When he observed McDaniel, he got out of the patrol car. McDaniel ran, and Moreno noticed that McDaniel had a handgun in his left hand. McDaniel fled into a nearby apartment. Inside that apartment, officers found McDaniel. In the stovetop, they found the unloaded TEC-9 handgun that they had previously seen in McDaniel's possession. Officer Shear was also pursuing McDaniel that day and searched the apartment. In an upstairs bedroom, Shear found an Uzi assault rifle and ammunition. The prosecutor presented evidence of McDaniel's conviction on June 27, 2002, for possession of an assault weapon.

On April 21, 2002, Ronnie Chapman was in his mother's backyard in Nickerson Gardens. Chapman's cousin Jeanette Geter saw McDaniel and his brother Tyrone approach

10

Chapman. She testified that she saw McDaniel shoot Chapman. Police officers saw McDaniel running less than a block away wearing a royal blue silk shirt. At trial, an officer testified that he found "the same blue shirt" at McDaniel's house in an unrelated incident.

On January 23, 2004, around midnight, officers responded to reports of gunfire at an address on East 111th Place. Officer Davilla secured the area by setting up a perimeter. McDaniel walked by and sat on the hood of a nearby car. Davilla ordered McDaniel to leave. McDaniel looked in Davilla's direction and said, "Fuck that shit." Davilla approached McDaniel, grabbed him, and escorted him away from the secured area. Davilla released McDaniel and told him he would be arrested if he did not leave. McDaniel raised his fists and walked toward Davilla, who pushed McDaniel backward. McDaniel then threw a punch at the top of Davilla's head. Davilla hit McDaniel in the face, and the two fell on the ground. Another officer hit McDaniel in the legs with a baton.

The defense called Joshua Smith, who witnessed this incident. Smith testified that this was a case of "police brutality" and that he had not heard McDaniel yell at the officer and had not seen him challenge the officer to a fight.

Kathryn Washington testified about the murder of Akkeli Holley, which occurred on July 4, 2003. Washington denied witnessing the murder, and the prosecution played a tape of a previous interview where she discussed witnessing the shooting. In her taped interview, she discussed seeing a shootout among Holley, a man named Roebell, and "R-Kelley" (McDaniel's moniker). Washington could not tell whether Roebell or R-Kelley was shooting. She testified that around the time Holley

was shot, she was using drugs daily, including PCP, cocaine, marijuana, alcohol, and methamphetamine. The defense again called Dr. Markman, who discussed the effects of these drugs on perception, as he had testified in the guilt phase.

On June 27, 2004, officers at the Men's Central Jail conducted a search of the cell that McDaniel shared with two other inmates. The search revealed several shanks that were concealed from view. Two shanks were found under one inmate's mattress. A single shank was found in a mattress that had McDaniel's property on top of it. The officer did not know how long McDaniel had been in that cell and acknowledged it was a transitional cell.

On June 21, 2006, McDaniel was using one of the phones in a cell in the Compton Courthouse lockup. A sheriff's deputy asked him to move cells, and McDaniel attempted to hit him with his right hand. The officer hit McDaniel twice in the face. McDaniel suffered bruising and swelling to his face, and the officer fractured his own hand.

On November 21, 2006, a sheriff's deputy was escorting an inmate from the law library back to his cell at the Men's Central Jail. As they passed the cell block, McDaniel and his cellmate threw several small cartons filled with excrement at the inmate.

b. *Victim Impact Evidence*

Anderson's brother testified about the impact of her death on their family. Anderson was the "backbone of the family" and "the life of the party. She just kept everybody's spirits up." She was a role model and lived in Nickerson Gardens "pretty much her whole life." Their mother took Anderson's death "real hard. . . . [H]er health just went down."

12

Anderson's only child, Neisha Sanford, testified about the impact of her mother's death. She described their close relationship and her mother's bond with her grandsons. Sanford discussed her mother's battle with cancer and the fact that "she wanted to start spending more time with [her grandsons] because she was sick." Anderson was the "core of the family." Since her mother's death, Sanford "[didn't] have a life anymore. My life ended four years ago. Him taking my mother's life, that was the end of my life."

Sanford's son also testified about the impact of his grandmother's death. He talked about spending "everyday" at his "little granny's home" and holidays like birthdays and Christmas. Her death "affect [*sic*] me a lot because me and my Grandma, we were really close. . . . [I]t make [*sic*] me sad all the time."

### 2. *Defense Case*

The defense case in mitigation focused on McDaniel's childhood, the pressures of living in Nickerson Gardens, his cognitive impairment from fetal alcohol syndrome, and his positive contributions to family members and friends.

McDaniel's mother testified that she drank while pregnant with McDaniel. McDaniel's father, who lived across the street with another woman, beat McDaniel's mother once in front of McDaniel and his brother. His early life was chaotic, and they frequently moved. At one point when McDaniel was about seven or eight, they lived on Skid Row. His mother started using cocaine at this time. She beat McDaniel with a belt to make him strong. Her brother Timothy was a father figure to McDaniel. Timothy sold drugs and was killed when McDaniel was about 12. His death affected McDaniel and made

him "angry and hostile, he really got involved with the gangs and stuff."

McDaniel's father testified that he and McDaniel's mother drank while she was pregnant with McDaniel. He never lived with McDaniel's mother and their children. He moved to Sacramento when McDaniel was two or three and did not return until he was 11 or 12. By that time, McDaniel had joined a gang. McDaniel's father testified that if you don't join a gang, you had problems and that Nickerson Gardens was a place people go to die.

The mother of McDaniel's two children described how McDaniel maintains a close relationship with them by sending cards and calling. She confirmed that McDaniel did "good things" for her and their children like buying diapers and being present at the hospital when they were born.

Two of McDaniel's cousins described Nickerson Gardens and the impact of Timothy's death on McDaniel. One explained, "Growing up in the projects as a young adult, especially a male, is a hard task. When you stay in it, you are bound to get caught up. And when I say caught up, that means either you are gonna die or you're going to go to jail for a long time."

McDaniel's friend testified that she wrote McDaniel from prison to tell him she was thinking about suicide, and he contacted the people in charge of the mental health unit to get her help. She credited McDaniel with saving her life.

Father Boyle is a Jesuit priest and the founder of Homeboy Industries, the largest gang intervention program in the country. Father Boyle did not know McDaniel but discussed the reasons that kids join gangs: "[T]hough the prevailing culture myth is that kids are seeking something when they join a

gang, . . . in fact they're fleeing something always. They're fleeing trauma. . . . They're fleeing sexual, emotional, physical abuse." He emphasized the need "to examine with some compassion the degree of difficulty there is in being free enough to choose" to join a gang.

Dr. Fred Brookstein is a professor of statistics and a professor of psychiatry and behavioral sciences. He directs a research unit that studies fetal alcohol and drug impacts on children. After analyzing a scan of McDaniel's brain, Dr. Brookstein found signs of brain damage caused by prenatal exposure to alcohol. He testified that people with this kind of damage have "problems with moral decisions."

Dr. Nancy Cowardin has a Ph.D. in educational philosophy and special education and runs a program called Educational Diagnostics. Based on her assessment of McDaniel in 2005 and a review of his school records, she opined that McDaniel has learning disabilities that predate his behavioral problems. McDaniel had a verbal IQ of 73 and a nonverbal IQ of 100. This "lopsidedness is what accounts for his learning disability."

## II. PRETRIAL ISSUES

### A. *Batson/Wheeler* Motion

McDaniel first claims that the prosecutor's use of a peremptory strike during jury selection prior to the guilt phase violated *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

#### 1. Facts

During voir dire, the judge conducted a first round of questioning to elicit prospective jurors' views on the death penalty. The judge asked jurors to rate themselves on a scale of

one to four based on their ability to impose the death penalty. Category one jurors "would never ever vote for death regardless of what the evidence was." Category two jurors are "proponents of the death penalty. . . . If he killed someone, he should die." A category three juror is "the person who says I'm okay with the death penalty. . . . But not me. I can't vote to put somebody to death." A category four juror is "comfortable with the fact that [he or she] can go either way."

After the court and parties resolved for-cause challenges based on prospective jurors' death penalty views, a second round of questioning on the non-capital portion of the questionnaire began. Before beginning, the trial court emphasized to counsel that this round of questioning was to be a "very limited voir dire to back up the questionnaires if there are responses on, oh, things, that somebody writes his occupation and you don't know what it is that he does and you want some information." Not every juror was questioned, and at times the judge interjected to remind counsel of the limited nature of the questioning. The prosecutor questioned jurors on their beliefs that police officers lie, experiences with gangs, law enforcement experience, prior jury experience, familiarity with Nickerson Gardens, drug history, and religious beliefs.

After additional for-cause challenges, the parties began exercising peremptory strikes. After the prosecutor struck Prospective Juror No. 28, defense counsel made a *Batson*/*Wheeler* motion. At that time, the prosecutor had used three of his eight peremptory strikes to excuse Prospective Jurors Nos. 7, 13, and 28, all of whom were Black. Four other Black jurors were seated in the box.

In support of his motion, defense counsel noted that Prospective Juror No. 28 "seemed fairly strong on the death penalty. There was nothing obvious in his questionnaire that I could see. . . ." The trial court noted that "[h]e is a 73-year-old man. He is a retired electrician. His nephew was arrested and charged with a crime that was not specified." The court found no prima facie case: "There are a lot of African Americans on this panel. There are a number that are seated in the box as we speak. I will be mindful of it but I am not going to find a prima facie case at this time."

The prosecutor later used his 11th and 12th peremptory strikes to remove Prospective Jurors Nos. 40 and 46, both of whom were Black. At that time, three other Black jurors were seated in the box. Defense counsel made a *Batson*/*Wheeler* motion. The court noted the prosecutor's three previous strikes against Black jurors, then found "a prima facie case of excusals based on race," and excused the jury for a hearing on the motion. The court told the prosecutor: "I am concerned about the fact that of the twelve peremptory challenges the People have exercised, five have been to African Americans." The court asked the prosecutor to explain his reasons for the strikes.

As to Prospective Juror No. 7, the prosecutor explained that her responses that she would always vote against death were such that "[he] had initially hoped to actually dismiss [her] for cause. . . ." The court agreed with this justification: "My notes reflect she said she would not always vote for death penalty. Always vote for life. Death would not bring back the victims. That she thought life without parole was more severe."

The prosecutor gave three reasons to excuse Prospective Juror No. 13. First, he was concerned that Prospective Juror

17

No. 13's response that "police officers lie . . . if it suits the needed outcome . . . indicated an anti-police bias." Her questionnaire suggested "concern about the effectiveness of the death penalty" and that "the death penalty is appropriate for a child victim," but the case did not involve child victims. Her husband was also a criminal defense attorney. The court made no comments about this juror and asked the prosecutor to continue to Prospective Juror No. 28.

The prosecutor offered three reasons to excuse Prospective Juror No. 28. "My primary problem with this juror was the fact that he, along with many others, . . . indicated that life without parole is a more severe sentence, which I don't think is a good instinct to have on a death penalty jury." The prosecutor offered additional reasons for the strike. Prospective Juror No. 28 also stated in his questionnaire that he did not want to serve on the trial because it would be too long. "I try not to have jurors on death penalty cases that don't want to be here. . . ." Finally, the prosecutor explained that he was "also trying, to the extent possible with the jurors available to me, to have a jury with as much formal education as possible. And this juror I think just completed 12th grade. . . ."

Defense counsel responded: "There were many jurors — those particular reasons, the education, L-WOP is more severe, the uncomfortable — you know, the time issue with regard to the jury, there are a lot of people on this panel that have reflected — and you corrected them in your opening remarks and they all backed off of any problem in that regard. As far as education goes, I haven't gone through it particularly but there are lots of jurors —."

The court interjected to confirm whether Prospective Juror No. 28 answered "no" to the question about whether he could impose the death penalty if he thought it was appropriate. Defense counsel confirmed that Prospective Juror No. 28 responded no, but that during voir dire he said he had made a mistake. "Yeah I don't remember that one way or the other. I just have a blank on that," the court said. "All right, let me hear your next excuse number."

As to Prospective Juror No. 40, the prosecutor explained that he challenged her due to her response that "[she didn't] want the responsibility of deciding anyone's guilt or innocence and possibly being wrong." The court did not comment on this justification and asked, "What about 46?"

The prosecutor explained that Prospective Juror No. 46 did not believe the death penalty was a deterrent, "which is not an attitude that I considered to be a fair attitude." He was also concerned that Prospective Juror No. 46 listened to a "very liberal political radio station where they frequently have specials and guest speakers and interviews that are anti-death penalty advocates."

Turning to the merits of the defense motion, the court said: "I have a great deal of respect for the attorney in this case, Mr. Dhanidina. And I hold him in high regard. He has tried many cases before me. I have always found him to be an utmost professional. I have never thought that he was trying to do anything underhanded. I believe peremptory challenges should have some flexibility in the way the judge looks at them. I am accepting of the articulated reasons that have been advanced here. I suppose the defense is arguing that we should — that this court should not allow 46 to be excused or are you arguing

that this — that Mr. Dhanidina is making false representations to the court and that this panel should be dismissed and we should start all over again? I would just like to know what the defense is saying."

Defense counsel replied that he was "not asking that the panel be dismissed and start all over. I am just asking that Juror Number 46 not be excused." After a pause in the proceedings, the court granted the request. "I am going to strike the peremptory. I feel that the radio station that somebody listens to is not a valid reason."

The prosecutor emphasized that the radio station was only one of the justifications that he offered. "And the juror works for a nonprofit. Volunteers. Works for an organization of urban possibilities. Just throughout the questionnaire there are a number of race-neutral reasons." He asked for a brief recess to "consult with [his] supervisors about what to do in this situation. Because this is highly unusual."

"I don't like the *Wheeler* law," the court said. "I am trying to apply it the best I can. I think that he looked like an acceptable juror. . . . I am not going to give you more time to research it. We're going to seat him and let's go on with it." After the prosecutor exercised an additional five peremptory strikes, both sides accepted the jury. The final jury contained four Black, three Hispanic, three White, and two Asian jurors.

On April 29, 2008, the jury hung in the penalty phase of deliberations, and the court declared a mistrial. On May 28, the prosecutor filed a motion for reconsideration of the *Batson*/*Wheeler* ruling on the ground that the court improperly applied the for-cause standard for dismissal. Specifically, the motion argued that the court's stated acceptance of "the reasons

articulated here" should have been enough to shift the burden back to McDaniel, and that the court's follow-up comment that "the radio station that somebody listens to is not a valid reason" showed that the court was applying the standard "reserved for for-cause challenges, when a judge is to determine whether or not actual bias has been shown."

The court heard the motion in July 2008, before beginning jury selection for the second penalty trial. The court asked defense counsel whether he felt the court erred. Defense counsel replied, "I have talked to Mr. Dhanidina and I have seen how the jury came out racial-wise and in terms of how many African Americans there were on the jury at the end of it. And I told Mr. Dhanidina that I would submit it to the court."

Denying the motion, the court said, "[T]his is a motion brought that really has nothing to do with this trial. It has something to do with the prosecutor's perception of his record as a prosecutor. . . . And I am a little reluctant to get into this because I just feel that this is something we shouldn't be doing." The court continued, "I don't think that I was wrong and I stand by my ruling. . . . I still don't think they [the prosecutor's reasons for striking Prospective Juror No. 46] were valid under the circumstances because I think there were other jurors who said similar statements as this juror. I just felt that in an abundance of caution and since this was a capital case that I had to do what I did."

### 2. *Analysis*

The Attorney General argues that in accepting the reseating of Prospective Juror No. 46, McDaniel waived his right to a new trial, which is the remedy he seeks in this appeal. McDaniel argues that because the court never found a

*Batson/Wheeler* violation as to Prospective Juror No. 28, it follows that he never waived a remedy for that violation. We need not decide this issue because, as we explain, McDaniel's claim fails on the merits.

The Fourteenth Amendment to the United States Constitution prohibits a party from using peremptory challenges to strike a prospective juror because of his or her race. (See *Batson*, *supra*, 476 U.S. at p. 89.) The high court set forth a three-step framework in *Batson* to determine whether a litigant has violated this right. First, the moving party must establish a prima facie case of discrimination "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." (*Id.* at p. 94.) Second, once the moving party "makes a prima facie showing, the burden shifts to the [striking party] to come forward with a neutral explanation for challenging" the prospective juror in question. (*Id.* at p. 97.) Third, if the proffered justification is race-neutral, then the court must consider whether the movant has proved it was more likely than not that the peremptory challenge was based on impermissible discrimination. (*Id.* at p. 98.)

The present case involves *Batson*'s third-stage requirement that the opponent of the strike prove purposeful discrimination. Beginning our review at the third stage is appropriate in the circumstances presented here. (See *People v. Scott* (2015) 61 Cal.4th 363, 392 (*Scott*).) After the trial court found no prima facie case with respect to Prospective Juror No. 28, the court later asked the prosecutor to explain his reasons for the strikes — including the strike of Prospective Juror No. 28 — in connection with McDaniel's subsequent *Batson/Wheeler* motion following the strike of Prospective Juror No. 46. McDaniel thus renewed his challenge to the excusal of

Prospective Juror No. 28 at that time, and the court rejected this renewed motion before discussing the requested remedy for the violation found regarding Prospective Juror No. 46.

At step three, courts look to all relevant circumstances bearing on the issue of discrimination. (See *Snyder v. Louisiana* (2008) 552 U.S. 472, 478.) Relevant circumstances may include the race of the defendant, the ultimate racial composition of the jury, the pattern of strikes, and the extent or pattern of questioning by the prosecutor during voir dire. (See *Miller-El v. Cockrell* (2003) 537 U.S. 322, 240–241, 245 (*Miller-El*); *Batson*, *supra*, 476 U.S. at p. 97; *Wheeler*, *supra*, 22 Cal.3d at p. 281.) A court may also consider the fact that the prosecutor impermissibly struck other jurors "for the bearing it might have upon the strike" of the challenged juror. (*Snyder*, at p. 478.) The high court has also held that comparative juror analysis may be probative of purposeful discrimination at *Batson*'s third stage. (*Miller-El*, at p. 241.) We defer to a trial court's ruling only if the court has made a " 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered' " by the prosecutor. (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1159 (*Gutierrez*).)

Here we find that the trial court made a sincere and reasoned attempt to evaluate the prosecutor's justifications based on the court's observations regarding the circumstances of the strike and its active participation in voir dire. In evaluating the justifications, the court asked the prosecutor questions and referred to its own notes, at times interjecting its own observations that confirmed the prosecutor's justifications. The record from the motion to reconsider the *Batson/Wheeler* ruling reveals that the court was also testing the applicability of the prosecutor's justifications against other jurors. In rejecting the prosecutor's reasons for striking Prospective Juror No. 46,

the court said: "I still don't think they were valid under the circumstances because I think there were other jurors who said similar statements as this juror." Throughout the process, the court made clear that it was cognizant of the prosecutor's rate of strikes and the current composition of the jury, which shows that the court considered the circumstances of the strikes.

Nor did the trial court overlook "powerful evidence of pretext," as McDaniel's briefing suggests, in declining to find a *Batson/Wheeler* violation as to Prospective Juror No. 28 when it granted McDaniel's *Batson/Wheeler* motion as to Prospective Juror No. 46. The parties dispute whether the court applied the correct standard in ruling on Prospective Juror No. 46. (See *People v. Baker* (2021) 10 Cal.5th 1044, 1076–1077 [focus is on the " 'genuineness' " of the proffered reasons, not their "analytical strength," though the latter may shed light on the former]; *People v. Cruz* (2008) 44 Cal.4th 636, 660; see also *Miller-El*, *supra*, 537 U.S. at pp. 338–339.) We can assume, without deciding, that it did. Although a prior *Batson* violation is a relevant circumstance for a court to consider in determining whether there was purposeful discrimination (see *Snyder*, *supra*, 552 U.S. at p. 478), the trial court here was well aware of the violation when it ruled on all five strikes at the same time.

McDaniel argues that under *Gutierrez*, a trial court is obligated to make specific findings "when the circumstances are so suspicious that follow-up and individualized analysis is the only way to create a record of 'solid value.' " In *Gutierrez*, we distinguished "neutral reasons for a challenge [that] are sufficiently self-evident, if honestly held, such that they require little additional explanation" from situations where "it is not self-evident why an advocate would harbor a concern." (*Gutierrez*, *supra*, 2 Cal.5th at p. 1171.) In the latter instances,

particularly where "an advocate uses a considerable number of challenges to exclude a large proportion of members of a cognizable group," the court must "clarif[y] why it accepted the . . . reason as an honest one." (*Id.* at p. 1171.) But unlike in *Gutierrez*, the prosecutor's justifications here did not require additional explanation. (See *People v. DeHoyos* (2013) 57 Cal.4th 79, 111 ["It is reasonable to desire jurors with sufficient education and intellectual capacity"]; *People v. Cash* (2002) 28 Cal.4th 703, 725 ["possible reluctance to vote for death" and "seeming reluctance to serve" are race-neutral justifications].)

McDaniel also suggests that deference is inappropriate here because the court denied the motion regarding Prospective Juror No. 28 based on a reason not offered by the prosecution. But we do not agree with McDaniel's reading of the record in this regard. Even though, as McDaniel notes, the trial court brought up a potential reason from Prospective Juror No. 28's questionnaire, it is not apparent that the trial court relied on it in denying the motion. Applying deference to the trial court's ruling, we conclude that substantial evidence supports the race-neutral reasons given by the prosecutor for his strike of Prospective Juror No. 28.

McDaniel is Black, and at the time of the second *Batson* motion, the prosecutor had used five of twelve peremptory challenges to strike Black jurors. As discussed below, this strike rate is significantly higher than the share of prospective jurors who were Black and higher than the percentage of prospective jurors then seated in the jury box who were Black. However, at the time the prosecutor struck Prospective Juror No. 46, three other Black jurors were seated in the box who would eventually serve on the jury. Juror Nos. 8 and 10 had been sitting in the

box since the beginning of jury selection. The prosecutor had also declined three times to strike Juror No. 7, who was seated in the box at that time.

Despite the relatively high rate of strikes against Black jurors at the time of the motion, the final racial composition of the jury was diverse and contained more Black jurors than jurors of any other race. Comparing the final composition of the jury to the overall pool reveals that Black jurors were overrepresented on the jury, even factoring in the disallowed strike of Prospective Juror No. 46. Black jurors comprised 16 percent of the total juror pool. The final jury was 33 percent Black. Even without Prospective Juror No. 46, Black jurors would have comprised 25 percent of the empaneled jury. To be sure, the fact that the final jury contained four Black jurors is not conclusive since the "[e]xclusion of even one prospective juror for reasons impermissible under *Batson* and *Wheeler* constitutes structural error." (*People v. Krebs* (2019) 8 Cal.5th 265, 292.) But the fact that the prosecution accepted a panel with three Black jurors when it had enough remaining peremptory challenges to strike them suggests that the prosecutor did not harbor bias against Black jurors. (See *id.* at p. 293.)

The same trend holds true when we compare the final jury to the composition of jurors who reached the box. Among the jurors who reached the box, 19 percent were Black. Although Black jurors comprised 42 percent of the prosecutor's strikes at the time of the *Batson/Wheeler* motion, the fact that Black jurors also comprised a disproportionate share (33 percent) of the empaneled jury compared to the Black percentage among jurors who reached the box tends to weigh against a finding of purposeful discrimination. (Cf. *People v Fuentes* (1991)

54 Cal.3d 707, 711–712 [finding *Batson* violation where prosecutor used 14 of 19 peremptory challenges to strike Black jurors and the sworn jury contained three Black jurors and three Black alternates].) At the same time, the fact that the trial court found the prosecutor violated *Batson*/*Wheeler* in striking Prospective Juror No. 46 is also a relevant consideration. (See *Snyder*, *supra*, 552 U.S. at p. 478.)

Although Prospective Juror Nos. 7, 13, and 40 were also the subject of peremptory challenges, McDaniel only challenges the strike of Prospective Juror No. 28. McDaniel urges us to find pretext in the fact that the prosecutor's voir dire of Prospective Juror No. 28 consisted of only one question, which was unrelated to his primary reason for the strike. In this case, after resolving the parties' challenges to prospective jurors for cause, the trial court urged both sides to limit voir dire. We have said that "trial courts must give advocates the opportunity to inquire of panelists and make their record. If the trial court truncates the time available or otherwise overly limits voir dire, unfair conclusions might be drawn based on the advocate's perceived failure to follow up or ask sufficient questions." (*People v. Lenix* (2008) 44 Cal.4th 602, 625.) Given the limitations on voir dire imposed by the trial court, as well as the fact that the prosecutor struck five non-Black jurors without asking them a single question, the observation that the prosecutor asked Prospective Juror No. 28 only one question is not by itself evidence of pretext.

McDaniel next argues that the prosecutor's education justification itself is a circumstance of pretext in that it disproportionately excluded Black jurors. " ' "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the

27

[classification] bears more heavily on one race than another." [Citation.] If a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination.' " (*People v. Melendez* (2016) 2 Cal.5th 1, 17–18, quoting *Hernandez v. New York* (1991) 500 U.S. 352, 363 (*Hernandez*).) Educational disparities in the seated jurors fell across racial lines. None of the Black seated jurors had attended college. Of the three White jurors who served, two had graduate degrees and one was pursuing a graduate degree. But the fact that the jury ultimately included four Black jurors lessens the inference that the prosecutor used this criterion to exclude Black jurors.

Nor do we infer pretext from the fact that other Black jurors served who had comparable education levels to Prospective Juror No. 28. The prosecutor did not couch the education criterion in categorical terms; he explained that he was trying "to the extent possible with the jurors available to me, to have a jury with as much formal education as possible." In addition to these qualified terms, the education justification was, by the prosecutor's own account, not the primary reason for striking Prospective Juror No. 28. Finding pretext because the prosecutor did not uniformly deploy this criterion to exclude Black jurors would perversely incentivize litigants to use "subjective criterion [that] hav[e] a disproportionate impact" to uniformly exclude jurors of certain racial groups. (*Hernandez, supra*, 500 U.S. at p. 370.)

We next compare Prospective Juror No. 28 with similarly situated non-Black panelists whom the prosecutor did not strike. (See *Miller-El, supra*, 545 U.S. at p. 241.) The

individuals compared need not be identical in every respect aside from ethnicity: "A per se rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." (*Id.* at p. 247, fn. 6.)

Prospective Juror No. 28 was a 73-year-old Black man. Before retiring, he was an electrician at an aircraft company. He had served in the military. He marked his education level as "12 years." He believed that LWOP was a more severe penalty than death. He indicated that he would not be open to considering evidence of mitigation in the penalty phase. He answered "no" to the question of whether regardless of his views, he would be able to vote for death if he believed, after hearing all the evidence, that the death penalty was appropriate. He said he would not like to serve on a jury because it was "to [*sic*] long." During voir dire, Prospective Juror No. 28 put himself in category 4, and the court asked no other questions except to remark that "you don't want to serve because this case is going to be too long. I appreciate you being here." The prosecutor's "primary concern" about Prospective Juror No. 28 was his views on the severity of life without the possibility of parole. One non-Black seated juror, Juror No. 4, expressed the same view on the questionnaire, as did three alternate jurors.

Juror No. 4 was a 30-year-old Hispanic man who worked as an office services coordinator. Like Prospective Juror No. 28, he answered that life without the possibility of parole was a more severe penalty because "in prison you have someone telling you when to sleep; wake; etc. In death you are done. So in prison it makes you like a kid again and no grown person likes that." During voir dire, he clarified that he saw himself as belonging to category 4. During voir dire, Juror No. 4 indicated that he

understood that death was the more severe penalty. Because Juror No. 4 clarified that he understood death was the more severe penalty, he was materially different from Prospective Juror No. 28.

McDaniel urges us not to consider Juror No. 4's rehabilitation because neither the prosecutor nor the judge questioned Prospective Juror No. 28 on this point. As described above, the judge encouraged the parties to limit voir dire; many prospective jurors were not asked any questions. The prosecutor's practice of asking jurors to raise their hands in response to questions also impeded the development of a full record on this point. But in a *Batson/Wheeler* motion, the burden is on the defendant to prove purposeful discrimination. (*Batson*, *supra*, 476 U.S. at p. 90.) Faced with a record that is silent in this way, we have no basis to infer that Prospective Juror No. 28, upon questioning, would have given an answer similar to Juror No. 4's.

Three alternate jurors also thought LWOP was the more severe penalty. Alternate Juror No. 2, a 48-year-old White man, believed LWOP was a more severe penalty because "[t]here's a long time to think about what you have done and pay for it every day." Alternate Juror No. 4, a 53-year-old Hispanic woman believed that LWOP was the more severe penalty because "[t]hey need to think about what they did for the rest of their life." Alternate Juror No. 5, a 32-year-old Hispanic woman, believed that LWOP was the more severe penalty because "[y]ou live the rest of your life in prison without freedom." During voir dire, these jurors confirmed they were category 4 jurors but were not asked any other questions about their death penalty views.

It is significant that these alternate jurors shared the same LWOP views as Prospective Juror No. 28 and that the prosecutor said his "primary concern" about Prospective Juror No. 28 was his views on LWOP compared to the death penalty. As discussed, however, there are circumstances here that dispel suspicion. McDaniel relies on *Snyder* to contend that once the prosecution's LWOP justification fails comparative analysis, the inquiry into discriminatory intent must end. But in *Snyder*, the high court's finding of a *Batson* violation flowed not simply from comparative analysis, but also from the fact that the prosecutor's justification was "highly speculative" and untethered to the record. (*Snyder*, *supra*, 552 U.S. at p. 482; see *id.* at pp. 482–483.) That is not the case here. All of the prosecutor's stated reasons were supported by the record. (See *People v. Reynoso* (2003) 31 Cal.4th 903, 924.) Moreover, in *Snyder*, the prosecutor struck all the Black jurors on the panel. (*Synder,* at p. 476.) At the time of the second *Batson*/*Wheeler* motion in this case, two Black jurors — Juror Nos. 8 and 10 — had been sitting in the box since the beginning of jury selection. The prosecutor had also declined three times to strike Juror No. 7, another Black juror who was seated in the box at that time. Finally, even excluding Prospective Juror No. 46, the jury would have contained the same number of Black jurors as it did White and Hispanic jurors, despite the fact that Black jurors comprised a lower percentage of both the overall jury pool and the prospective jurors who reached the jury box.

Ultimately, having considered the totality of the circumstances, including the fact that the judge found a *Batson*/*Wheeler* violation for Prospective Juror No. 46, we conclude that the trial court's ruling was supported by substantial evidence.

### 3. *Motion for Judicial Notice*

McDaniel urges us to take judicial notice of the *Batson*/*Wheeler* proceedings in his codefendant Kai Harris's trial. A reviewing court may take judicial notice of records of "any court of this state" provided that the moving party provides the adverse party notice of the request. (Evid. Code, § 452, subd. (d)(1); see also Evid. Code, §§ 459, 453.) Yet even when these criteria are met, the reviewing court retains some discretion to deny judicial notice. Without deciding whether such information is generally relevant to an appellate court's review of a trial court's *Batson*/*Wheeler* ruling on direct review, we exercise our discretion to deny the request here. We do so without prejudice to McDaniel presenting such information on a fuller record in connection with a petition for habeas corpus if he so chooses. (See *Foster v. Chatman* (2016) 578 U.S. __ [136 S.Ct. 1737]; *Miller-El, supra*, 537 U.S. 322.)

## B. Denial of Motion to Suppress Firearm

McDaniel next challenges the trial court's denial of his motion to suppress the gun discovered during the April 11, 2004, traffic stop. McDaniel argues that because the officer lacked reasonable suspicion of criminal activity, he could not order McDaniel to remain in the car against his will. Because the gun would not have been discovered if he had been permitted to leave the scene, it should have been suppressed. McDaniel argues its admission was prejudicial error under the state and federal Constitutions.

### 1. *Facts*

Five days after the shooting, Los Angeles County Sheriff's Deputies Marcus Turner and Eric Sorenson were on vehicle patrol at 120th Street and Central Avenue near Nickerson

Gardens. Deputy Turner noticed a blue Toyota without a license plate and activated the lights to pull the car over. The car continued driving for about 10 seconds. Deputy Turner noticed the passenger's head moving back and forth "like he was conversating [*sic*] with the driver" but did not notice other suspicious movements. A few seconds after Deputy Turner activated the sirens, the car pulled over.

As soon as the car stopped, the passenger door opened, and a man later identified as McDaniel began to exit the vehicle. Deputy Sorenson had just begun to exit the police car. Deputy Turner, who was still in the driver's seat, testified on direct examination that "the passenger door came open and the passenger at the door stepped out and made a motion and tried to run out of the vehicle." On cross-examination, Deputy Turner acknowledged that McDaniel was standing up in the door well but had not stepped beyond the door. He acknowledged that it was not unusual for passengers to exit vehicles during traffic stops. Deputy Turner testified that his partner yelled, " 'Get back in the car,' " and McDaniel complied.

Deputy Turner arrested the driver of the Toyota for not having a driver's license and placed him in the police car. Because the driver had no driver's license, the deputies decided to impound the vehicle. Deputy Turner returned to the car to pull out the passenger so that he could inventory the car. As he extended his hand to McDaniel, he noticed a bulge in McDaniel's right pocket that resembled a gun. Deputy Turner patted him down and retrieved a loaded Ruger semiautomatic handgun and a separate loaded magazine.

After argument, the judge denied McDaniel's motion to suppress, saying, "I think the officer had every right to do what

he did under the circumstances and I was particularly persuaded by the fact that he had decided to inventory the car once he determined that the driver did not have a license. And I found his testimony to be credible."

### 2. *Analysis*

The Attorney General argues that McDaniel's claim is forfeited because defense counsel never explicitly stated that "the deputies violated his Fourth Amendment rights when they ordered him to return to the car" and did not cite any of the authorities relied on in this appeal. Because we can resolve McDaniel's claim on the merits, we need not decide whether it was forfeited.

For purposes of the Fourth Amendment, both the driver and passenger are seized when an officer pulls over a vehicle for a traffic infraction. (*Brendlin v. California* (2007) 551 U.S. 249, 251 (*Brendlin*).) Following a lawful traffic stop, a police officer may order the driver out of the vehicle pending completion of the stop. (*Pennsylvania v. Mimms* (1997) 434 U.S. 106, 111 (*Mimms*).) In *Maryland v. Wilson* (1997) 519 U.S. 408, 410 (*Wilson*), the high court extended the *Mimms* rule to the passengers of legally stopped vehicles. The high court observed that "traffic stops may be dangerous encounters," and the "same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger." (*Wilson,* at p. 413.) The court reasoned that the " 'risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.' " (*Id.* at p. 414, quoting *Michigan v. Summers* (1981) 452 U.S. 692, 702–703.) The case for the passenger's personal liberty is "stronger than that for the driver," but as a practical

matter, since the passenger is already stopped, "[t]he only change in their circumstances which will result . . . is that they will be outside of, rather than inside of, the stopped car." (*Wilson*, at p. 414.)  The court characterized this additional intrusion as "minimal" given that the presence of "more than one occupant of the vehicle increases the possible sources of harm to the officer."  (*Id.* at pp. 413, 415.)

*Wilson* left open whether an officer may order a passenger of a legally stopped vehicle to remain in the car after the passenger has attempted to exit.  (*Wilson*, *supra*, 519 U.S. 408, 415, fn. 3.)  McDaniel argues that *Terry v. Ohio* (1968) 392 U.S. 1 governs, requiring "articulable suspicion" to detain the passenger of a lawfully stopped vehicle.  (*Id.* at p. 31; see also *id.* at p. 21, fn. omitted [officer must point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the stop].)  Yet the high court in *Arizona v. Johnson* (2009) 555 U.S. 323 (*Johnson*) observed that *Mimms*, *Wilson*, and *Brendlin* "cumulatively portray *Terry*'s application in a traffic-stop setting" and "confirm[ed]" that "the combined thrust" of those three decisions is "that officers who conduct 'routine traffic stop[s]' may 'perform a "patdown" of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous.' " (*Johnson*, at pp. 331–332.)

*Johnson* further elaborated that "[a] lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation.  The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop.  Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave.   [Citation.]  An officer's

inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." (*Johnson, supra*, 555 U.S. at p. 333.) Indeed, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'— to address the traffic violation that warranted the stop, [citation] and attend to related safety concerns." (*Rodriguez v. United States* (2015) 575 U.S. 348, 354.) Although "certain unrelated checks" by an officer may be tolerated, absent reasonable suspicion a traffic stop " 'can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission.' " (*Id.* at p. 354; see *id.* at pp. 354–355.)

McDaniel's detention here complied with high court precedent. Under *Johnson*, his temporary seizure was reasonable for the duration of the stop, and Deputy Sorenson "surely was not constitutionally required to give [McDaniel] an opportunity to depart the scene after he exited the vehicle without first ensuring that, in so doing, [the officer] was not permitting a dangerous person to get behind [him]." (*Johnson, supra*, 555 U.S. at p. 334, fn. omitted.) There is no indication that the officers did anything more than that or otherwise prolonged the stop beyond the time reasonably required to complete the mission. Deputy Turner processed the driver for the Vehicle Code violation while Deputy Sorenson stood next to the passenger side of the vehicle with his gun drawn. Because the driver had no license, the deputies decided to impound and inventory the vehicle. The officers then promptly investigated whether McDaniel posed a threat. When Deputy Turner directed his attention to McDaniel, who was still sitting in the

passenger seat, he observed a bulge in his pocket that resembled the shape of a gun. A reasonable officer observing the outline of a gun in a passenger's pocket would perceive an ongoing safety threat that justifies a pat down search. Under these circumstances, admission of the gun was not error.

## C. Admission of Kanisha Garner's Hearsay

McDaniel argues that the trial court improperly admitted hearsay evidence that was the basis for the gang enhancement under section 186.22, subdivision (b)(1). He claims that the admission of the hearsay evidence, in addition to being error under the Evidence Code, also violated his rights under the state and federal Constitutions to a fair and reliable capital sentencing hearing and due process.

### 1. Facts

Before trial, the prosecutor filed a motion in limine to introduce hearsay statements made by George Brooks to his sister Kanisha Garner concerning how he obtained the drugs he sold as a declaration against interest. In support he attached Kanisha's testimony from the trial of Kai Harris. (We refer to the witness by first name to avoid confusion with Elois Garner.) The court held a brief hearing during which defense counsel objected to the admission of the statements on federal constitutional grounds. The court asked whether Brooks's statement was testimonial, and defense counsel conceded that it was "probably not testimonial." The court admitted the statement "over objection."

The Attorney General urges us to find the argument forfeited because defense counsel did not object to Kanisha's testimony at trial. The Attorney General points to our decisions holding that a motion in limine does not always preserve the

issue if the party fails to object once the evidence is offered. (*People v. Morris* (1991) 53 Cal.3d 152, 190, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.) Because we can resolve McDaniel's claim on the merits, however, we need not decide whether it was forfeited.

The parties also dispute which version of the hearsay statements should be considered: Kanisha's statements from Kai Harris's trial that the prosecutor proffered during the pre-trial motion or the statements that she actually made at trial. We need not decide which statements are the proper focus of review. Although cross-examination of Kanisha at McDaniel's trial yielded a more forceful declaration that Brooks did not intentionally steal the drugs, Kanisha's statements at Harris's trial were substantially similar. Both statements contain the admission that Brooks was dealing drugs. Both statements recount how he obtained the drugs, who gave him the drugs, as well as the fact that he did not pay for them and that Billy Pooh was looking for him.

### 2. *Analysis*

A declaration against interest is an exception to the general rule that hearsay statements are inadmissible under California law. (Evid. Code, §§ 1200, subd. (b), 1230.) "Evidence Code section 1230 provides that the out-of-court declaration of an unavailable witness may be admitted for its truth if the statement, when made, was so far against the declarant's interests, penal or otherwise, that a reasonable person would not have made the statement unless he or she believed it to be true." (*People v. Westerfield* (2019) 6 Cal.5th 632, 704.) The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. (*People v.*

*Frierson* (1991) 53 Cal.3d 730, 745.) " ' "In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." ' " (*People v. Masters* (2016) 62 Cal.4th 1019, 1055–1056.) We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion. (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).)

McDaniel does not dispute that Brooks's admission that he was dealing drugs was a declaration against his penal interest. He argues that the statements detailing how he obtained the drugs and from whom should be excluded as a collateral statement because they were not against his penal or social interest, and they lack indicia of trustworthiness.

The Attorney General argues that the collateral statements were sufficiently against Brooks's social interest because "Brooks's statement regarding whom he had stolen the drugs from and the circumstances surrounding the theft would most certainly subject Brooks to retaliation by Carey and appellant, and possibly the Bounty Hunters." McDaniel in turn argues that the statements were designed to enhance Brooks's social status because claiming "that he had obtained a few ounces of cocaine from a top level distributor in the projects . . . is clearly suggestive of 'an exercise designed to enhance his prestige.' " (See *People v. Lawley* (2002) 27 Cal.4th 102, 155 (*Lawley*) [a hearsay declarant seeking admission in Aryan Brotherhood who claims to be carrying out the organization's

will in killing victim might have been an exercise designed to enhance prestige].)

Unlike in *Lawley*, where the declarant was seeking full membership in the Aryan Brotherhood, the record does not suggest that Brooks, who was already a Bounty Hunter Blood, was seeking a higher social status in that gang. To the contrary, Kanisha testified that Brooks had recently been released from prison, and Carey "was trying to give him some stuff to make money with out of jail." Her responses to his description of the "incident" in which he did not pay for the drugs indicate that she feared for him and that she expected he would face retaliation from Carey and his associates who had "status in the projects." In light of this evidence, we conclude that the trial court did not abuse its discretion in admitting the statements as a declaration against social interest.

### D. *Pitchess* Motion

McDaniel requests that we independently review the sealed record of the trial court discovery rulings pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*) in order to determine whether the in camera review process complied with the law.

Before trial, McDaniel filed several *Pitchess* motions seeking to discover documents related to incidents that the prosecution planned to use in the penalty phase. McDaniel initially sought discovery into "complaints of dishonesty, lying, falsifying or fabricating evidence, committing perjury, and the like" for two Los Angeles County Sheriff's Department deputies. The trial court ruled McDaniel had not made a sufficient showing for an in camera hearing.

McDaniel subsequently sought discovery into "incidents of fabrication, lying, assaultive conduct, and excessive force" and "harassment" on the part of 14 Los Angeles Police Department officers. He additionally sought discovery into "assaultive behavior, mistreatment of people in custody, [and] dishonesty" for four Los Angeles County Sheriff's Department deputies. The judge found good cause and, due to the volume of the requests, conducted four in camera hearings.

" 'When a defendant shows good cause for the discovery of information in an officer's personnel records, the trial court must examine the records in camera to determine if any information should be disclosed. [Citation.] The court may not disclose complaints over five years old, conclusions drawn during an investigation, or facts so remote or irrelevant that their disclosure would be of little benefit. [Citations.] *Pitchess* rulings are reviewed for abuse of discretion.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 338 (*Rivera*).) Although Evidence Code section 1045, subdivision (b)(1) excludes from disclosure "[i]nformation consisting of complaints concerning conduct occurring more than five years before the event or transaction that is the subject of the litigation in aid of which discovery or disclosure is sought," disclosure of such information may still be required under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). (See *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 13–15 & fn. 3.)

In this case, the record includes sealed transcripts of the in camera hearings and copies of all the documents that the trial court reviewed. With respect to Los Angeles County Sheriff's Department records, the custodian of records made all potentially relevant documents available to the trial court for review, was placed under oath at the in camera hearing, and

stated for the record " 'what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion.' " (*Rivera*, *supra*, 7 Cal.5th at p. 339.) The trial court found information for two deputies that it deemed discoverable. However, because the trial was about to start, the court, instead of disclosing this information to the defense, ruled that the prosecution could not use the incidents that involved these deputies.

With respect to the Los Angeles Police Department records, the custodian of records made available to the trial court for review all potentially relevant information from the relevant *Pitchess* periods and the time since. The record in this case also shows that defense counsel waived any right to have the custodian or the court review any older records that might have been available. Accordingly, this is not an appropriate case to further consider the handling of confidential records more than five years old. (*City of Los Angeles*, *supra*, 29 Cal.4th at p. 15, fn. 3; see *People v. Superior Court* (*Johnson*) (2015) 61 Cal.4th 696, 715–722 [resolving issue regarding prosecutors' *Brady* obligations based on the premise that defendants can ensure production of *Brady* material through the *Pitchess* process]; see also *Association for Los Angeles Deputy Sheriffs v. Superior Court* (2019) 8 Cal.5th 28, 55 [discussing *Johnson*'s reasoning].)

In sum, based on our review of these records, we conclude that the trial court examined all the relevant information and otherwise complied with applicable law.

## III. GUILT PHASE ISSUE

### Sufficiency of the Evidence for Gang Enhancement

McDaniel argues that there was insufficient evidence of collaborative activities or collective organizational structure to support the gang enhancement conviction under section 186.22, subdivision (b)(l).

To prove the existence of a criminal street gang, we explained in *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*) that section 186.22, subdivision (f) requires: an " 'ongoing organization, association, or group of three or more persons' that shares a common name or common identifying symbol; that has as one of its 'primary activities' the commission of certain enumerated offenses; and 'whose members individually or collectively' have committed or attempted to commit certain predicate offenses." (*Prunty*, at p. 66.) McDaniel challenges the sufficiency of the prosecution's evidence connecting the predicate offenses to the Bounty Hunter Bloods and the evidence connecting himself to the Bounty Hunter Bloods.

Detective Kenneth Schmidt testified that between 1998 and 2006 he worked as a gang detective in Nickerson Gardens gathering intelligence on the Bounty Hunter Bloods. He described the signs and symbols particular to the Bounty Hunter Bloods, like hats and hand signs with the letter "B" and red clothing. Their turf was "predominately in and around Nickerson Gardens." Primary activities of the gang included "narcotics, street robberies and a lot of crimes involving shootings and murder."

Schmidt identified McDaniel in court and described his gang tattoos: a tattoo across his back that read "Nickerson," and the letters "B" and "H" on the back of his arms that stood for

"Bounty Hunter." McDaniel also had tattoos of "A" and "L" for Ace Line, "C" and "K" for Crip Killer, "BIP" for Blood in Peace, and "BHIP" for Bounty Hunter in Peace.

Schmidt also described a tattoo of "111," which stood for 111th Street, "the north end of the Nickerson Gardens, also known as Ace Line." Ace Line refers to "one of the clicks [*sic*] inside Bounty Hunters itself." Schmidt described the various cliques within the Bounty Hunters in Nickerson Gardens and the lack of "structured hierarchy other than O.G., old gangsters that have been around longer." The cliques "all grow up together. They live together. It could be at anyone [*sic*] point in time, they'll say they're Ace Line or Five Line." Sometimes there was "inner gang fighting" over turf for drug sales. He testified that he had seen William Carey (Billy Pooh), a known narcotics trafficker, with McDaniel on fewer than 10 occasions. He identified Carey, George Brooks, Derek Dillard, Prentice Mills, and Kai Harris as Bounty Hunter Bloods.

Schmidt described predicate crimes committed by Ravon Baylor, who "admitted to [him] that he was a Bounty Hunter Blood," and Lamont Sanchez, whom he "knew as a Bounty Hunter Blood also." This knowledge was based on statements and wiretaps overheard during an investigation for murder and attempted murder. The prosecutor introduced the certified records of Baylor and Sanchez's convictions.

" 'We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction.' [Citation.] 'We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted

simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*Rivera*, *supra*, 7 Cal.5th at p. 331.)

McDaniel argues that under *Prunty*, the prosecution had to prove that McDaniel knew Baylor and Sanchez because these two gang members belonged to "an unidentified clique of the umbrella gang the Bounty Hunter Bloods." *Prunty* held that a showing of an associational or organizational connection is required when the prosecution, in seeking to prove that a defendant committed a felony to benefit a given gang, establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets. (*Prunty*, *supra*, 62 Cal.4th at p. 67.)

In this case, there were no allegations that Baylor and Sanchez were members of a subset of the Bounty Hunter Bloods. The prosecution relied on McDaniel's membership in the umbrella organization of the Bounty Hunter Bloods to prove the organizational nexus with the predicate offenses committed by two documented Bounty Hunter Bloods. In closing, the prosecutor argued that the shooting "benefitted the Bounty Hunters because it sent the message of what happens to you when you mess with one of the higher members of the gang." Defense counsel was free to cross-examine the gang expert as to the basis of his classification of the predicate offenders and establish their allegiance to a particular subset of the umbrella organization. McDaniel did not do so. Moreover, Schmidt's testimony established that, whatever their cliques, the Bounty Hunter Bloods gang members "all grow up together," "live together," and "at anyone [*sic*] point in time, they'll say they're Ace Line or Five Line," thus evidencing "fluid or shared membership among the subset or affiliate gangs" (*Prunty*,

45

*supra*, 62 Cal.4th at p. 78). And although McDaniel contends that the different cliques of the Bounty Hunter Bloods "feuded" like "Hatfields and McCoys," *Prunty* also observed that "evidence that subset gangs have periodically been at odds does not necessarily preclude treating those gangs collectively under the STEP Act [California Street Terrorism Enforcement and Prevention Act of 1988]." (*Prunty*, at p. 80.) We conclude that substantial evidence supports the enhancements.

To the extent we construe McDaniel's claims to challenge the sufficiency of an organizational nexus between himself and the Bounty Hunter Bloods, we find this claim unpersuasive. Unlike *Prunty*, where the defendant admitted he was a " 'Norte' and a 'Northerner' " but claimed identification with the Detroit Boulevard subset (*Prunty*, *supra*, 62 Cal.4th at p. 68), the evidence that McDaniel was a Bounty Hunter Blood includes more than the fact that he had Bounty Hunter Bloods tattoos. While the Norteños' gang turf encompassed the "broad geographic area" of Sacramento (*Prunty*, at p. 79), the Bounty Hunter Bloods' turf was limited to the area in and around Nickerson Gardens. Schmidt's testimony also revealed an association between McDaniel and Carey, a Bounty Hunter Blood. (See *Prunty*, at p. 73, ["long-term relationships among members of different subsets" and "behavior demonstrating a shared identity with one another or with a larger organization"].) And Schmidt testified that Kai Harris was a Bounty Hunter Blood, and six witnesses placed McDaniel and Harris together on the night of the murders. Angel Hill testified that McDaniel told Harris, "You disappointed me, man," and bragged about the shooting to Carey. From these facts, the jury could have inferred relationships, "shared goals," and the fact that these Bounty Hunter Bloods members " 'back up each

other.'" (*Prunty*, at p. 78.) These facts are sufficient to establish an organizational link between McDaniel and the Bounty Hunter Bloods.

## IV. PENALTY PHASE ISSUES

### A. Anderson's Cancer Diagnosis

McDaniel contends that the court erred in admitting evidence of Anderson's cancer diagnosis during the penalty phase, in violation of his rights to a fair penalty trial and a reliable penalty determination.

At the penalty trial, Anderson's daughter, Neisha Sanford, testified that her mother was diagnosed with cancer in 1989 and, from that point on, was "back and forth" in treatments like chemotherapy that caused her to lose her hair. Sanford testified that the treatments made her mother ill and "affected her a lot." "She drank, you know, she had on and off ongoing problems with drugs and stuff. Yeah. She dealt with it pretty rough," Sanford said. Anderson had a recurrence of cancer prior to her death and wanted to spend more time with her grandchildren.

Before the start of the penalty retrial, the trial court held an Evidence Code section 402 hearing to determine the admissibility of this evidence and to reconsider its prior ruling that the defense could not introduce evidence that Anderson had drugs in her system at the time of her death. The prosecutor argued that the cancer evidence was relevant to show Anderson was a vulnerable victim, which was a circumstance of the crime under section 190.3, subdivision (a). He argued that the evidence also contextualized the other victim impact testimony and mitigated evidence that Anderson had drugs in her system at the time of her death. The court noted that the cancer evidence and the toxicology report "kind of tie together" and

admitted both, reasoning that "[o]ne approach to take, is throw up my hands and let it all come in and let the jury there sort it out, which will probably be the safest way from an appellate review standpoint."

Under the Eighth Amendment to the federal Constitution, evidence relating to a murder victim's personal characteristics and the impact of the crime on the victim's family is relevant to show the victim's " 'uniqueness as an individual human being' " and thereby "the specific harm caused by the defendant." (*Payne v. Tennessee* (1991) 501 U.S. 808, 823, 825.) The federal Constitution bars this evidence only if it is so unduly prejudicial as to render the trial fundamentally unfair. (*Ibid.*) In California, such evidence is generally admissible as a circumstance of the crime pursuant to section 190.3, subdivision (a). " 'On the other hand, irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed.' " (*People v. Edwards* (1991) 54 Cal.3d 787, 836 (*Edwards*), overruled on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176.)

In *People v. Clair* (1992) 2 Cal.4th 629, 671, evidence of a victim's cerebral palsy was a relevant circumstance of the crime because it "could tend to show that defendant mounted and executed his fatal attack without significant resistance — and therefore with unnecessary brutality." Here, by contrast, the shooting occurred moments after Anderson opened the door, and the prosecution did not introduce evidence that linked her cancer with her vulnerability to this type of attack.

The Attorney General argues that this evidence was properly admitted and showed Anderson's uniqueness and the

impact of her death on family members. Yet we need not resolve the issue because even assuming admission of the cancer evidence was error, we find no prejudice. The mere reference to the fact that Anderson was ill at the time of her death was not likely to "divert[] the jury's attention from its proper role or invite[] an irrational, purely subjective response." (*Edwards*, *supra*, 54 Cal.3d at p. 836.) The court had already ruled that the prosecution could not use more inflammatory evidence of Anderson's cancer, such as photos of her undergoing chemotherapy. In light of other circumstances of the murders — such as the fact that Anderson was shot multiple times at close range — and the other acts of violence adduced during the penalty phase, there is no reasonable possibility that the cancer testimony affected the penalty phase verdict. (*People v. Abel* (2012) 53 Cal.4th 891, 939 ["[I]n light of the nature of the crime and the other aggravating factors, including defendant's criminal history, there is no reasonable possibility [victim's mother's testimony] affected the penalty verdict."])

## B. Lingering Doubt Instruction

McDaniel next argues that the trial court erred in refusing to instruct the penalty phase jury on lingering doubt. He urges us to reconsider our holdings that a lingering doubt instruction is not constitutionally required. (*People v. Streeter* (2012) 54 Cal.4th 205, 265 (*Streeter*); *People v. Hamilton* (2009) 45 Cal.4th 863, 948 (*Hamilton*).) Even if not constitutionally required in all cases, McDaniel argues that the circumstances warrant an instruction.

During the penalty-phase instructional conference, the trial court considered defense counsel's request for an instruction that the jury "may, however, consider any lingering

doubt you have about the evidence in deciding penalty." The trial court denied the request, explaining "I am not going to give a lingering doubt instruction since this a retrial of the penalty phase. I don't want the jury speculating about the crime." After closing argument, defense counsel proposed two slightly different instructions related to lingering doubt. The trial court again rejected the instruction, explaining that "the problems I have with that is, that this jury did not hear the evidence in the guilt phase and I think it would be inappropriate. [¶] I allowed Mr. Brewer to make somewhat [*sic*] I thought was far ranging comments about the crime. . . ."

McDaniel argues that specific circumstances in this case warranted a lingering doubt instruction. The first circumstance is that he had requested a lingering doubt instruction. But an objection alone does not warrant an instruction. (E.g., *Streeter*, *supra*, 45 Cal.4th at p. 265 [trial court properly refused request for lingering doubt instruction]; *People v. Brown* (2003) 31 Cal.4th 518, 567 [same].)

McDaniel also argues that a lingering doubt instruction is warranted where the penalty phase jury is not the jury that had rendered the guilt verdicts. We have repeatedly held that a lingering doubt instruction for a second penalty-phase jury is not required where that jury is " 'steeped' " in the nuances of the capital crimes. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 326; *People v. DeSantis* (1992) 2 Cal.4th 1198, 1239–1240.) In the penalty phase, the prosecution and defense introduced the guilt-phase eye-witness testimony and ballistics evidence that McDaniel asserts is relevant to lingering doubt. In closing argument, defense counsel emphasized the ballistics evidence from the gun linked to Harris to suggest that McDaniel did not cause the "mayhem" alone. Defense counsel also referenced

inconsistencies and gaps in the testimony of Angel Hill and Derrick Dillard to argue there was insufficient evidence that McDaniel himself created all the "carnage."

Next, McDaniel argues that the trial court repeatedly instructed the jury that it "must accept" the guilt phase jury's finding that McDaniel had personally killed Anderson, which left no room for them to consider lingering doubt. Compounding the error of this instruction, he claims, was the prosecutor's argument that McDaniel had personally killed Anderson, which relied heavily on an appeal to the findings of the prior jury. McDaniel's reliance on *People v. Gay* (2008) 42 Cal.4th 1195, 1224, where the trial court instructed the jury that the defendant's responsibility had been "conclusively proven and that there would be no evidence presented in this case to the contrary," is inapposite. In *Gay*, the error that the trial court's statements compounded was the trial court's limitation of evidence related to lingering doubt in the penalty phase. (*Ibid.*) As discussed above, ample evidence of this lingering doubt was introduced. Moreover, a statement that the jury "must" accept the guilt-phase findings is qualitatively different than a statement that the defendant's guilt has been "conclusively proven" and that no evidence would be introduced to the contrary. (*Ibid.*) Nor did the prosecutor's statements that "the verdicts have significance in this case, ladies and gentleman," preclude the jury from considering lingering doubt. These comments merely conveyed the fact that the prior jury found McDaniel to be the actual shooter.

In sum, the circumstances of this case do not warrant departure from our precedent holding that the lingering doubt instruction is not constitutionally required. (*Streeter*, *supra*, 54 Cal.4th at p. 265; *Hamilton*, *supra*, 45 Cal.4th at p. 948.)

## C. California Jury Trial Right

McDaniel contends that Penal Code section 1042 and article I, section 16 of the California Constitution require the penalty phase jury to unanimously determine all "issues of fact," including factually disputed aggravating circumstances. He further contends that these provisions require the penalty phase jury to determine the ultimate penalty verdict beyond a reasonable doubt. Because numerous instances of aggravating evidence, including ten instances of past crimes, were introduced in the penalty phase, McDaniel contends that the failure to instruct on unanimity was prejudicial. McDaniel also argues that the failure to instruct on the reasonable doubt standard requires reversal. We asked the Attorney General for supplemental briefing to address these issues in greater detail, as well as a reply from McDaniel.

In light of our request for supplemental briefing, a number of amici curiae also sought leave to file briefs informing the court of their positions. These amici present a range of perspectives on the relevant issues before us. Some amici focus on the historical understanding of the California Constitution's jury trial right. Others argue that there is no binding precedent because this case presents issues that our cases have not carefully considered. Many amici focus on issues and arguments adjacent to the core questions posed by our briefing order, which specifically concerned Penal Code section 1042 and California Constitution article I, section 16. For example, some arguments are grounded principally in the federal jury trial right, including *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and its progeny. These arguments are distinct from the state law issues before us, and we address McDaniel's arguments related to the federal jury trial right separately below. Several amici,

including Governor Gavin Newsom, advance views of history and social context that link capital punishment with racism. These claims sound in equal protection, due process, or the Eighth Amendment's prohibition on cruel and unusual punishment, and do not bear directly on the specific state law questions before us. Finally, two amici support respondent and argue that neither the California Constitution nor the Penal Code requires unanimity or a reasonable doubt standard at the penalty phase.

With these perspectives before us, we examine (1) whether unanimity is required for factually disputed aggravating circumstances during the penalty phase and (2) whether reasonable doubt applies to the jury's ultimate penalty determination. At oral argument, the Attorney General acknowledged that McDaniel and amici advance "persuasive arguments . . . that imposing" the requirements "that the jury unanimously determine beyond a reasonable doubt factually disputed aggravating evidence and the ultimate penalty verdict . . . would improve our system of capital punishment and make it even more reliable." The Attorney General also noted that "statutory reforms to impose those requirements deserve serious consideration, particularly in light of the important policy concerns that McDaniel and his amici have raised." Nevertheless, the Attorney General contends, state law as it stands does not require jury unanimity on factually disputed aggravating circumstances or application of the reasonable doubt standard to the ultimate penalty determination. Having carefully considered these claims, we conclude that the Attorney General is correct.

### 1. *Unanimity*

Article I, section 16 provides: "Trial by jury is an inviolate right and shall be secured to all, but in a civil cause three-fourths of the jury may render a verdict. A jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel." (Cal. Const., art. I, § 16.) Penal Code section 1042 provides: "Issues of fact shall be tried in the manner provided in Article I, Section 16 of the Constitution of this state." Together these provisions codify a right to juror unanimity on issues of fact in criminal trials.

We have previously held that jury unanimity on the existence of aggravating circumstances is not required under the state Constitution. (See, e.g., *People v. Hartsch* (2010) 49 Cal.4th 472, 515.) McDaniel urges us to reconsider this precedent because those cases rested on " 'uncritical' analysis" of the state jury trial right and did not discuss the applicability of section 1042. Various amici likewise suggest that there is no binding precedent on this issue or that we should depart from any such precedent. McDaniel appears correct that these decisions, while speaking generally of California constitutional provisions, did not rest on any considered analysis of our state constitutional or statutory guarantee. (See, e.g., *People v. Griffin* (2004) 33 Cal.4th 536, 598 [summarily rejecting challenges under "the Sixth Amendment's jury trial clause, the Eighth Amendment's cruel and unusual punishment clause, the Fourteenth Amendment's due process and equal protection clauses, and the analogous provisions of, apparently, article I, sections 7, 15, 16, and 17"], disapproved on other grounds in *People v. Riccardi* (2012) 54 Cal.4th 758.) McDaniel also observes that although our decisions have primarily considered

application of the federal Sixth Amendment jury trial right to our capital punishment scheme (see, e.g., *People v. Snow* (2003) 30 Cal.4th 43, 126, fn. 32; *People v. Rangel* (2016) 62 Cal.4th 1192, 1235, fn. 16), the federal right is not coextensive with the state jury trial right (see *Mitchell v. Superior Court* (1989) 49 Cal.3d 1230, 1241).

We are mindful that McDaniel's "state constitutional . . . claim cannot be resolved by a mechanical invocation of current federal precedent." (*People v. Chavez* (1980) 26 Cal.3d 334, 352; see also *People v. Ramos* (1984) 37 Cal.3d 136, 153 [death penalty instruction was "incompatible with this [state constitutional] guarantee of 'fundamental fairness' " although it did not violate federal due process principles]; *People v. Engert* (1982) 31 Cal.3d 797, 805 (*Engert*) [former death penalty statute violates state due process clause although it likely did not violate Eighth Amendment].) As we explain, however, McDaniel does not persuade us that there is an independent state law principle grounded in Article I, Section 16 requiring unanimity among the penalty jury in order to find the existence of aggravating circumstances in the face of disputed evidence.

As an initial matter, we note that although McDaniel raises a question of state constitutional and statutory law with applicability to a wide range of factual determinations beyond the context of capital sentencing, his arguments also rest to a significant degree on the analytical underpinnings of the United States Supreme Court's Sixth Amendment jurisprudence. *Apprendi* and its progeny fundamentally concern sentencing and require any fact, other than the fact of a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum to be found by a unanimous jury and proved beyond a reasonable doubt. (*Apprendi*, *supra*, 530 U.S. at

p. 490.) The statutory maximum in this context means the maximum sentence permissible based solely on the facts reflected in the jury's verdict or admitted by the defendant. (*Blakely v. Washington* (2004) 542 U.S. 296, 303.)

We have rejected arguments that the Sixth Amendment requires unanimity with respect to aggravating circumstances because "the jury as a whole need not find any one aggravating factor to exist" under the statute and the penalty determination "is a free weighing of all the factors relating to the defendant's culpability." (*People v. Snow*, *supra*, 30 Cal.4th at p. 126, fn. 32; see *People v. Capers* (2019) 7 Cal.5th 989, 1014; *People v. Rangel*, *supra*, 62 Cal.4th at p. 1235.) Even if we were to revisit that conclusion, it is a discrete Sixth Amendment issue, not a general issue concerning the scope of the jury trial right with implications beyond the sentencing context. (See, e.g., Evid. Code, §§ 1101, subds. (b) & (c), 1108, subds. (a) & (b).) And we have not adopted *Apprendi*'s reasoning as our own independent understanding of article I, section 16 of the California Constitution, nor has McDaniel asked us to.

Separate and apart from Sixth Amendment principles, McDaniel argues that aggravating factors — in particular, factually disputed evidence of past criminal acts under factor (b) or factor (c) of section 190.3 — are "issues of fact" within the meaning of section 1042. Courts have described the state constitutional guarantee as attaching to "the trial of issues that are made by the pleadings." (*Dale v. City Court of City of Merced* (1951) 105 Cal.App.2d 602, 607; see also *Koppikus v. State Capitol Commissioners* (1860) 16 Cal. 249, 254 [state jury trial right is a "right . . . which can only be claimed in actions at law, or criminal actions, where an issue of fact is made by the pleadings"].) Section 1041 specifies that an "issue of fact" arises

"[u]pon a plea of not guilty." McDaniel relies on section 190.3, which states that "no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." He argues that "[t]o the extent that aggravating factors and the punishment of death are required to be raised in pleadings," the aggravating evidence is an "issue of fact" within the meaning of section 1042. In response, the Attorney General argues that because a defendant cannot plead to a particular sentence during the penalty phase, the notice of aggravating circumstances is not within the scope of sections 1041 and 1042.

The focus of a capital penalty proceeding differs from the guilt trial. (See *People v. Lenart* (2004) 32 Cal.4th 1107, 1136 ["Choosing between the death penalty and life imprisonment without possibility of parole is not akin to 'the usual fact-finding process' "].) In the guilt trial, the statutory special circumstance establishes a factual predicate of the capital offense. We have characterized the statutory special circumstance as the eligibility factor that "narrow[s] the class of death-eligible first degree murderers." (*People v. Sapp* (2003) 31 Cal.4th 240, 287.) The "fact or set of facts" that undergird the special circumstance must be "found beyond a reasonable doubt by a unanimous verdict" in order to "change[] the crime from one punishable by imprisonment of 25 years to life to one which must be punished either by death or life imprisonment without possibility of parole." (*Engert, supra*, 31 Cal.3d at p. 803, fn. omitted; see § 190.4, subd. (a).)

In the penalty trial, aggravating and mitigating circumstances aid the jury in selecting the appropriate penalty. After a true finding on the special circumstance, the penalty

phase jury must determine "whether the aggravating circumstances, as defined by California's death penalty law (§ 190.3), so substantially outweigh those in mitigation as to call for the penalty of death, rather than life without parole." (*People v. Anderson* (2001) 25 Cal.4th 543, 589.) Aggravating circumstances, such as section 190.3, factor (b) or factor (c) evidence, "enable the jury to make an individualized assessment of the character and history of a defendant to determine the nature of the punishment to be imposed." (*People v. Grant* (1988) 45 Cal.3d 829, 851.)

Although section 190.3 requires notice of aggravating circumstances, this notice does not establish that an aggravating circumstance comes within the meaning of section 1041 or 1042. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 799 [contrasting notice requirement of section 190.3 with offenses charged in an information], abrogated on other grounds in *Scott*, *supra*, 61 Cal.4th 363.) As a matter of state law, the factual assessments for aggravating circumstances at the penalty phase are akin to the determinations jurors make in considering prior uncharged crimes in the guilt phase of a trial. (Evid. Code, § 1101, subd. (b) [evidence of prior misconduct relevant in determining motive, opportunity, and intent]; *id.*, subd. (c) [prior misconduct relevant for impeachment].) In some circumstances, admission of these prior acts also requires notice. For example, when a criminal defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense may be admissible under certain circumstances provided that notice is served on the defendant before trial. (Evid. Code, § 1108, subds. (a) & (b); see also § 1054.7.) Jury unanimity has not been held to be a prerequisite to individual jurors considering this evidence (see CALCRIM No. 1191A); the

mere requirement of notice, without more, does not transform these prior criminal acts into "issues of fact" within the meaning of sections 1041 and 1042.

Moreover, jury unanimity does not normally extend to subsidiary or foundational factual issues in other contexts. As McDaniel observes, the jury in a typical guilt trial must be unanimous in its verdict and must agree on the specific crime of which the defendant is guilty. (See *People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*); *People v. Diedrich* (1982) 31 Cal.3d 263, 281.) But the jury need not unanimously agree on subsidiary factual issues, such as specific details of the act. (See *Russo*, at p. 1132 ["[W]here the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or . . . the 'theory' whereby the defendant is guilty."]; *People v. Mickle* (1991) 54 Cal.3d 140, 178, fn. omitted ["[T]he unanimity rule does not extend to the minute details of how a single, agreed-upon act was committed."].) We have said that aggravating factors for purposes of section 190.3 are such "foundational" matters that do not require jury unanimity. (*People v. Miranda* (1987) 44 Cal.3d 57, 99 ["Generally, unanimous agreement is not required on a foundational matter. Instead, jury unanimity is mandated only on a final verdict or special finding."], disapproved on another ground in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4; *People v. Hines* (1997) 15 Cal.4th 997, 1067 ["Jury unanimity on such 'foundational' matters is not required."].) We see no basis in section 1042 or article I, section 16 for the unanimity rule that McDaniel urges here.

McDaniel focuses specifically on factor (b) and factor (c) evidence and, relying on *Russo*, argues that because these

factors require consideration of multiple discrete crimes, they implicate section 1042. We explained in *Russo* that in a standard criminal guilt trial, "when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Russo, supra*, 25 Cal.4th at p. 1132.) To hold otherwise would create a " 'danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*Ibid.*) But the jury's consideration of factor (b) or factor (c) evidence in a capital penalty trial does not present the same concern. The finding of a prior offense under factor (b) or factor (c) alone is not sufficient under the statute for the jury to return a death verdict, nor does it automatically lead to such a result. Accordingly, neither factor (b) nor factor (c) evidence implicates section 1042.

This is not to say there are no limits on the introduction of aggravating evidence. The creation in 1957 of a bifurcated guilt and penalty trial in capital cases "broaden[ed] the scope of relevant evidence admissible on the issue of penalty," including evidence of other crimes, provided that its admission was consistent with other evidentiary rules. (*People v. Purvis* (1959) 52 Cal.2d 871, 883, disapproved on another ground in *People v. Morse* (1964) 60 Cal.2d 631, 637, fn. 2, 648–649 (*Morse*); see *Purvis*, at pp. 883–884 [evidence of other crimes cannot be proven with hearsay]; *People v. Hamilton* (1963) 60 Cal.2d 105, 134, disapproved on another ground in *Morse*, at pp. 637, fn. 2, 648–649 and *People v. Daniels* (1991) 52 Cal.3d 815, 866 ["flimsy, speculative testimony should not have been admitted" in penalty trial].) As evidence of past crimes became increasingly integrated into the penalty phase, this court has

expressed concerns that "in the penalty trial the same safeguards should be accorded a defendant as those which protect him in the trial in which guilt is established." (*People v. Terry* (1964) 61 Cal.2d 137, 149, fn. 8.) Evidence of prior criminal acts "may have a particularly damaging impact on the jury's determination whether the defendant should be executed." (*People v. Polk* (1965) 63 Cal.2d 443, 450 (*Polk*).)

Recognizing the need for safeguards in the capital sentencing context, our cases have departed from the rule, applicable at guilt trials, that the preponderance of the evidence standard generally applies to proof of prior crimes before the jury may consider them. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 381; see also, e.g., *People v. Foster* (2010) 50 Cal.4th 1301, 1346 [in a guilt trial (1) the jury cannot "consider the evidence of defendant's prior crimes unless it found those crimes proven by a preponderance of the evidence; (2) it [can]not find defendant guilty unless the prosecution proved the charged offenses beyond a reasonable doubt; and (3) if the evidence of prior crimes was necessary to prove an essential fact, the jury [can]not rely upon that evidence unless the prosecution proved the prior crimes beyond a reasonable doubt"].) At capital penalty trials, before jurors can consider evidence of past crimes as an aggravating factor, "they must be convinced beyond a reasonable doubt" that the defendant committed the crime. (*Polk, supra,* 63 Cal.2d at p. 451; see *People v. McClellan* (1969) 71 Cal.2d 793, 804–806.) Relying on this precedent, we have read the same requirement into subsequent iterations of the death penalty statute. (See *People v. Robertson* (1982) 33 Cal.3d 21, 53–55 [applying this rule to the 1977 death penalty statute]; *Miranda, supra,* 44 Cal.3d at p. 97 [current death penalty statute]; see also *People v. Williams*

(2010) 49 Cal.4th 405, 458–459 [applying rule to factor (b) evidence].) We have since emphasized that "the rule is an evidentiary one and is not constitutionally mandated." (*Miranda*, at p. 98.)

McDaniel does not press a due process justification for the unanimity requirement, nor does he offer an evidentiary justification that would require unanimity on aggravating evidence. When trial courts have given a unanimity instruction on aggravating circumstances, we have said that requiring "a unanimous special finding in that regard actually provided greater protection than that to which defendant was entitled under the statute." (*People v. Caro* (1988) 46 Cal.3d 1035, 1057.) "As to the possibility that jurors who were not convinced of defendant's guilt in the uncharged crimes might have been influenced by the prejudicial effect of the evidence, such a risk is inherent in the introduction of any evidence of prior criminal activity under factor (b), and . . . 'the reasonable doubt standard ensures reliability.' " (*Ibid.*)

To the extent some amici argue that a constitutional right to unanimity also attaches to the ultimate penalty determination, we express no view on that issue as McDaniel does not advance this argument and the statute already contains such a requirement. (§ 190.4, subd. (b).)

In sum, while this court has previously imposed additional reliability requirements on the jury's consideration of aggravating evidence in the penalty phase, we hold that neither article I, section 16 of the California Constitution nor Penal Code section 1042 provides a basis to require unanimity in the jury's determination of factually disputed aggravating circumstances.

## 2. *Reasonable Doubt*

McDaniel also asks us to reconsider our prior holding that the state Constitution does not require the degree of certainty attached to the jury's ultimate decision to impose the death penalty to be " 'beyond a reasonable doubt.' " (*People v. Hartsch, supra*, 49 Cal.4th at p. 515.) His arguments also seem to require the jury to be instructed that in order to choose a death verdict, it must find that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt; various amici explicitly argue as much. McDaniel is correct that our prior decisions have not fully considered the state jury trial right or section 1042 in this context.

Pointing to *People v. Hall* (1926) 199 Cal. 451, McDaniel and various amici argue that the state jury trial right was historically understood to apply to the capital sentencing decision as a constitutional matter. *Hall* said: "Under the law the verdict in such a case must be the result of the unanimous agreement of the jurors and the verdict is incomplete unless, as returned, it embraces the two necessary constituent elements; first, a finding that the accused is guilty of murder in the first degree, and, secondly, legal evidence that the jury has fixed the penalty in the exercise of its discretion." (*Id.* at p. 456.) There, the jury returned a guilty verdict but made no penalty determination and specifically disclosed in its verdict that it could not reach a "unanimous agreement as to degree of punishment." (*Id.* at p. 453.) The trial court nonetheless entered judgment and imposed the death penalty. We viewed this as error and reasoned that "[i]n legal effect th[e jury trial] right was denied to the defendant in the case at bar," rejecting the government's argument that "the defect in the form of the

verdict constitute[d] no more than 'matter of procedure.' " (*Id.* at pp. 457–458.)

For further support, McDaniel points to *People v. Green* (1956) 47 Cal.2d 209 (*Green*), which overruled a line of our cases beginning with *People v. Welch* (1874) 49 Cal. 174 (*Welch*), and to Justice Schauer's dissenting opinion in *People v. Williams* (1948) 32 Cal.2d 78, 89–100, 101–104 (dis. opn. of Schauer, J.)). In *Welch*, a case predating *Hall*, this court interpreted the language in section 190 "as if it read" that a defendant convicted of first degree murder " '[s]hall suffer death, or (in the discretion of the jury) imprisonment in the State prison for life.' " (*Welch*, at p. 180.) *Welch* understood the jury's discretion to be "restricted" such that it "is to be employed only where the jury is satisfied that the lighter penalty should be imposed," and thus the lesser punishment of life imprisonment could be imposed only where the jury unanimously found it appropriate. (*Id.* at p. 179.) Under *Welch*, jury unanimity as to a judgment of death was not required, and a jury verdict of first degree murder that was silent as to punishment would result in a sentence of death.

After *Welch*, a line of our cases criticized its holding yet refused to find error in jury instructions following it. (*Green*, *supra*, 47 Cal.2d at pp. 227–229 [collecting cases].) In some cases, however, we adopted a different construction of section 190, holding that "the Legislature 'confided the power to affix the punishment within these two alternatives to the absolute discretion of the jury, with no power reserved to the court to review their action in that respect.' " (*Id.* at p. 229, quoting *People v. Leary* (1895), 105 Cal. 486, 496). *Hall* partially receded from *Welch*'s holding and required jury unanimity for a sentence of death to be imposed, at least where the verdict was not completely silent on the matter. (*Hall*, *supra*, 199 Cal. at

pp. 456–458.)  Yet it was not until 1956 that this court formally overruled *Welch* and its progeny by holding in *Green* that section 190 "indicates no preference whatsoever as between the two equally fixed alternatives of penalty" and that it would be "error to instruct contrary to the terms of the statute."  (*Green*, at pp. 231–232.)

McDaniel points out that *Green* stated "it is for the *jury* — not the law — to fix the penalty" (*Green, supra*, 47 Cal.2d at p. 224) and cited with approval language from the high court's opinion in *Andres v. United States* (1948) 333 U.S. 740 that the Sixth Amendment's "requirement of unanimity extends to all issues — character or degree of the crime, guilt and punishment — which are left to the jury."  (*Green*, at p. 220, quoting *Andres*, at p. 748.)  Moreover, Justice Schauer's dissent in *Williams* explained his view that the state jury trial right "and the statutes (Pen. Code, §§ 190, 1042, 1157) give to a defendant charged with murder the right, where he does not waive a jury trial, to have the jury determine not only the question of his guilt or innocence and the question of the class and degree of the offense, but also, if the offense be murder of the first degree, the penalty to be imposed.  The law does not give any preference to either penalty but leaves such selection solely to the jury, and it requires that the jury be unanimous in its determination of the penalty as it must be unanimous on the questions of guilt and class or degree of the crime."  (*Williams, supra*, 32 Cal.2d at p. 102 (dis. opn. of Schauer, J.).)

Yet none of these authorities specifically discuss a reasonable doubt standard for the capital penalty determination; at most, they could support the conclusion that a defendant has the right to a determination by a unanimous jury.  Because section 190.4, subdivision (b) already contains

such a requirement, we need not reach this question as a constitutional matter. If anything, the authorities cited by McDaniel and amici suggest that the ultimate penalty determination is entirely within the discretion of the jury, without any preference for either of the two available punishments, not necessarily that the jury may choose the death penalty only if it believes the punishment is warranted beyond a reasonable doubt.

The crux of McDaniel's argument is that article I, section 16 encompasses the protections of the common law right to a jury trial, including the right to factual findings by a jury beyond a reasonable doubt, and that article I, section 16 applies to the capital penalty determination, thereby requiring the jury to select the appropriate punishment using a reasonable doubt standard. For present purposes, we assume without deciding that McDaniel's foundational premise is correct — i.e., that the right to a reasonable doubt standard governing factfinding by a jury in criminal cases is secured by article I, section 16 and not solely grounded in due process (see *In re Winship* (1970) 397 U.S. 358, 364; *People v. Flood* (1998) 18 Cal.4th 470, 481). Even so, we conclude that the jury's ultimate decision selecting the penalty in a capital case does not constitute "factfinding" in any relevant sense.

We have consistently described the penalty jury's sentencing selection in terms that eschew a traditional factual inquiry. We have emphasized that the penalty verdict " 'constitute[s] a single fundamentally normative assessment' " (*People v. Duff* (2014) 58 Cal.4th 527, 569) and "is inherently normative, not factual" (*People v. Lightsey* (2012) 54 Cal.4th 668, 731). Indeed, we have rejected applying the harmlessness standard under *People v. Watson* (1956) 46 Cal.2d 818 because

a "capital penalty jury . . . is charged with a responsibility different in kind from . . . guilt phase decisions: its role is not merely to find facts, but also — and most important — to render an individualized, *normative* determination about the penalty appropriate for the particular defendant — i.e., whether he should live or die." (*People v. Brown* (1988) 46 Cal.3d 432, 448; see also *Watson*, at p. 836.)

We also have cited *Kansas v. Carr* (2016) 577 U.S. 108 to support our conclusion that capital "sentencing is an inherently moral and normative function." (*People v. Winbush* (2017) 2 Cal.5th 402, 489.) *Carr* considered whether "the Eighth Amendment requires capital-sentencing courts . . . 'to affirmatively inform the jury that mitigating circumstances need not be proven beyond a reasonable doubt.' " (*Carr* at pp. 118–119.) In rejecting such a requirement, the high court explained that whereas the statutory "facts justifying death . . . either did or did not exist[,] . . . [w]hether mitigation exists . . . is largely a judgment call (or perhaps a value call)" and "what one juror might consider mitigating another might not." (*Ibid.*)

As *Carr* and our precedent explain, the jury's selection of the penalty in a capital case under existing law is not a traditional factfinding inquiry. Even if the jury trial right under article I, section 16 is applicable to the penalty phase of a capital trial and encompasses the right to factual findings beyond a reasonable doubt, we do not understand it to require the penalty phase jury to select the appropriate punishment beyond a reasonable doubt.

As McDaniel and various amici note, at one time during the era of unitary guilt and penalty trials, our court expressed a preference for a reasonable doubt standard for the penalty

verdict. In *People v. Cancino* (1937) 10 Cal.2d 223 (*Cancino*), the court reasoned that "it would be more satisfactory in death penalty cases if the court would instruct the jurors that if they entertain a reasonable doubt as to which one of two or more punishments should be imposed, it is their duty to impose the lesser." (*Id.* at p. 230.) *Cancino* nevertheless upheld an instruction that omitted a burden of proof for the penalty verdict; the court found dispositive the fact that the instructions "fully informed" the jury "as to its discretion." (*Ibid.*)

In *People v. Perry* (1925) 195 Cal. 623 (*Perry*), the trial court apparently gave the jury three instructions related to the penalty determination. The defendant challenged one instruction that, consistent with *Welch*, said (1) "while the law vests [the jury] with a discretion as to whether a defendant shall suffer death or confinement in the state prison for life, this discretion is not an arbitrary one, and is to be employed only when the jury is satisfied that the lighter penalty should be imposed." (*Id.* at p. 640.) This was given alongside two other instructions: (2) " '[i]f the jury should be in doubt as to the proper penalty to inflict the jury should resolve that doubt in favor of the defendant and fix the lesser penalty, that is, confinement in the state prison for life,' " and (3) "[i]n the exercise of your discretion as to which punishment shall be inflicted, you are entirely free to act according to your own judgment." (*Ibid.*) We stated the law as follows: "It is the jury's right and duty to consider and weigh all the facts and circumstances attending the commission of the offense, and from these and such reasons as may appear to it upon a consideration of the whole situation, determine whether or not in the exercise of its discretion, life imprisonment should be imposed rather than the infliction of the death penalty." (*Ibid.*)

We ultimately held in *Perry* that there was no error with the challenged instruction and that if "there was any vice . . . it was rendered harmless" by the third instruction quoted above. (*Ibid.*)

As McDaniel notes, *People v. Coleman* (1942) 20 Cal.2d 399 characterized *Perry* as having "held" that "if any doubt be engendered as to the punishment to be imposed, the jury should not impose the extreme penalty." (*Id.* at p. 406.) But this was not *Perry*'s holding, and we have instead cited *Perry* repeatedly for the proposition that it is the jury's "duty to consider and weigh all the facts and circumstances" and then to "exercise . . . its discretion" in selecting the penalty. (*Perry*, *supra*, 195 Cal. at p. 640; see *Hall*, *supra*, 199 Cal. at p. 455; *People v. Leong Fook* (1928) 206 Cal. 64, 69; *People v. Pantages* (1931) 212 Cal. 237, 271; see also *Green*, *supra*, 47 Cal.2d at p. 227 [describing *Perry* as a case where we "affirmed judgments imposing the death sentence where instructions based on the *Welch* decision . . . were given" but "disapproved the giving of such instructions"].) Today CALCRIM No. 766 and CALJIC No. 8.88 apprise the jury of its sentencing discretion. (See CALCRIM No. 766 ["Determine which penalty is appropriate and justified by considering all the evidence and the totality of any aggravating and mitigating circumstances."]; CALJIC No. 8.88 ["To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."]; *People v. Leon* (2020) 8 Cal.5th 831, 849–850.)

Contrary to McDaniel's contention, *Cancino* and *Perry* neither hold nor suggest there is a constitutional requirement that a jury make the capital penalty determination using a

reasonable doubt standard. Those cases, decided in the context of unitary capital trials, found that giving such an instruction was not error under the statutes then in force when accompanied by an instruction explaining the jury's ultimate discretion in selecting the appropriate penalty. It is not clear that decisions like *Cancino* and *Perry* have any further significance to the constitutional question at hand. Rather, we think those cases must be understood in the context of this court's conflicting decisions regarding the jury's role in capital sentencing under section 190 following *Welch* and before that decision was finally overruled in *Green*. *Green* made clear that "[t]he law . . . indicates no preference whatsoever as between the two equally fixed alternatives of penalty." (*Green, supra*, 47 Cal.2d at p. 231.) And following *Green*, this court repeatedly rejected the argument that a reasonable doubt instruction as to punishment is required. (See, e.g., *People v. Purvis* (1961) 56 Cal.2d 93, 96 (*Purvis*), disapproved on another ground in *Morse, supra*, 60 Cal.2d at pp. 637, fn. 2, 648–649.)

McDaniel and amici also point to language in the 1957 death penalty statute, which bifurcated the guilt and penalty trials for the first time. That statute provided that "determination of the penalty . . . shall be in the discretion of the . . . jury trying the issue of fact on the evidence presented, and the penalty fixed shall be expressly stated in the decision or verdict." (Stats. 1957, ch. 1968, § 2, p. 3510.) They argue that this statutory language treats the "determination of the penalty" as an "issue of fact" within the meaning of section 1042 and thus the reasonable doubt standard, as required by article I, section 16, applies.

But, as explained, the penalty jury's ultimate sentencing decision is not a traditional factual determination in any

relevant sense. Moreover, whatever the Legislature understood "issue of fact" to mean within the context of the 1957 death penalty statute does not control the meaning of "issue of fact" in section 1042, which far predates the 1957 law. Section 1042 was first enacted in 1872, when the death penalty was hardly an obscure or hidden feature for felony convictions. As amicus curiae Criminal Justice Legal Foundation noted in its brief, "Nearly all felonies were nominally capital offenses at common law. (See 4 W. Blackstone, [Commentaries (1st ed. 1769)] p. 98.)" (See *Tennessee v. Garner* (1985) 471 U.S. 1, 13 & fn. 11.) Section 1042's companion provision, section 1041, was also enacted in 1872 and specifies circumstances that give rise to an issue of fact under section 1042: "An issue of fact arises: [¶] 1. Upon a plea of not guilty. [¶] 2. Upon a plea of a former conviction or acquittal of the same offense. [¶] 3. Upon a plea of once in jeopardy. [¶] 4. Upon a plea of not guilty by reason of insanity." (§ 1041.) Even if section 1041 does not provide an exhaustive list, it is notable that the penalty determination is not an enumerated "issue of fact." Indeed, when section 1041 was last amended by the Legislature in 1949, California law specified the death penalty as an appropriate punishment for six separate crimes, ranging from first degree murder to perjury in a capital case and kidnapping for ransom. (See Subcom. of the Judiciary Com., Rep. on Problems of the Death Penalty and its Administration in California (Jan. 18, 1957) Assembly Interim Committee Reports 1955–1957, Vol. 20, no. 3, p. 22.)

Our early construction of the 1957 statute further confirms that the penalty determination is not an "issue of fact" under section 1042. The 1957 law set forth three phases of a capital trial with separate determinations: guilt, penalty, and sanity at the time of the commission of the offense. Consistent

with then-existing law, the penalty phase included an exemption from the death penalty for "any person who was under the age of 18 years at the time of the commission of the crime" (Stats. 1957, ch. 1968, § 2, p. 3510), which previously had been construed to "impose[] the burden of proof by a preponderance of evidence on the defendant . . . on the issue of under-age" (*People v. Ellis* (1929) 206 Cal. 353, 358). This structure appeared to recognize that burdens of proof can apply to certain determinations in the post-guilt phases, such as minority or insanity. But the statute did not specify a burden of proof for the penalty determination itself. To the contrary, the statute, consistent with *Green*, *Perry*, and *Hall*, entrusted the penalty determination entirely to "the discretion of the court or jury." (Stats. 1957, ch. 1968, § 2, p. 3510.) And, for whatever reason, the Legislature and the electorate chose not to retain this reference to "issue of fact" in subsequent iterations of the death penalty scheme.

Shortly after enactment of the 1957 statute, Justice Traynor, writing for the court, reiterated that "the jury has absolute discretion in fixing the penalty and is not required to prefer one penalty over another" and upheld the trial court's rejection of an instruction "that if [the jury] entertained a reasonable doubt as to which of the penalties to impose, the lesser penalty should be given." (*Purvis*, *supra*, 56 Cal.2d at p. 96, fn. omitted.) Despite the language in the 1957 statute now relied on by McDaniel and amici, *Purvis* rejected the argument that a reasonable doubt standard applies to the penalty determination and gave no indication that section 1042 had any bearing on the matter. Instead, *Purvis* construed the 1957 statute in a manner consistent with *Green*'s holding that the prior version of section 190 "indicate[d] no preference

whatsoever as between the two equally fixed alternatives of penalty." (*Green, supra*, 47 Cal.2d at p. 231.) Although *Purvis*'s discussion of this issue was brief, this court reaffirmed and applied *Purvis*'s holding in several cases. (See *In re Anderson* (1968) 69 Cal.2d 613, 622–623; *People v. Smith* (1966) 63 Cal.2d 779, 795; *People v. Hines* (1964) 61 Cal.2d 164, 173, disapproved of on another ground in *People v. Murtishaw* (1981) 29 Cal.3d 733, 774, fn. 40; *People v. Hamilton, supra,* 60 Cal.2d at p. 134; *People v. Harrison* (1963) 59 Cal.2d 622, 633–634; *People v. Howk* (1961) 56 Cal.2d 687, 699.) We see no basis in section 1042 or in the 1957 statute or its legislative history to revisit *Purvis*'s holding, and we have rejected arguments that the current capital punishment scheme statutorily requires a reasonable doubt standard at the penalty phase. (See *People v. Virgil* (2011) 51 Cal.4th 1210, 1278.)

McDaniel also notes that Colorado, New Jersey, Nebraska, and Utah have read the reasonable doubt standard into their death penalty statutes based in part on concerns grounded in due process, the Eighth Amendment, and fundamental fairness. As the New Jersey Supreme Court explained, "[i]f anywhere in the criminal law a defendant is entitled to the benefit of the doubt, it is here. We therefore hold that as a matter of fundamental fairness the jury must find that aggravating factors *outweigh* mitigating factors, and this balance must be found beyond a reasonable doubt." (*State v. Biegenwald* (N.J. 1987) 524 A.2d 130, 156; see also *People v. Tenneson* (Colo. 1990) 788 P.2d 786, 797 ["[T]he jury still must be convinced beyond a reasonable doubt that the defendant should be sentenced to death."]; *State v. Wood* (Utah 1982) 648 P.2d 71, 83 ["Furthermore, in our view, the reasonable doubt standard also strikes the best balance between the

interests of the state and of the individual for most of the reasons stated in *In re Winship* [(1970)] 397 U.S. 358"]; *State v. Simants* (Neb. 1977) 250 N.W.2d 881, 888, disapproved on another ground in *State v. Reeves* (Neb. 1990) 453 N.W.2d 359 [reading reasonable doubt burden into silent statute].) At least one state has imposed this requirement for the penalty verdict by statute. (Ark. Code Ann. § 5-4-603, subd. (a)(3).)

To the extent the Attorney General argues that implementation of the reasonable doubt standard and jury unanimity with regard to the ultimate penalty verdict would be unworkable, practice from other states suggests otherwise. Moreover, as noted, the Attorney General has acknowledged that requiring the penalty jury to "unanimously determine beyond a reasonable doubt factually disputed aggravating evidence and the ultimate penalty verdict . . . would improve our system of capital punishment and make it even more reliable," and that statutory reforms "deserve serious consideration." Nevertheless, to date our Legislature and electorate have not imposed such requirements by statute, and the out-of-state holdings above are based at least in part on due process or Eighth Amendment grounds. McDaniel does not ask us to reconsider our precedent that has concluded otherwise as a matter of due process.

In sum, having examined our case law and relevant history, we are unable to infer from the jury trial guarantee in article I, section 16 of the California Constitution or Penal Code section 1042 a requirement of certainty beyond a reasonable doubt for the ultimate penalty verdict.

### D. Additional Challenges to the Death Penalty

McDaniel raises a number of challenges to the constitutionality of California's death penalty statute that we have previously rejected, and we decline to revisit those holdings in this case.

"Penal Code sections 190.2 and 190.3 are not impermissibly broad, and factor (a) of Penal Code section 190.3 does not make imposition of the death penalty arbitrary and capricious." (*People v. Sánchez* (2016) 63 Cal.4th 411, 487 (*Sánchez*).)

As described above, " '[e]xcept for evidence of other crimes and prior convictions, jurors need not find aggravating factors true beyond a reasonable doubt; no instruction on burden of proof is needed; the jury need not achieve unanimity except for the verdict itself; and written findings are not required.' " (*Sánchez, supra*, 63 Cal.4th at p. 487.)

Likewise, we have held that the high court's decision in *Hurst v. Florida* (2016) 577 U.S. 92 does not alter our conclusion under the federal Constitution or under the Sixth Amendment about the burden of proof or unanimity regarding aggravating circumstances, the weighing of aggravating and mitigating circumstances, or the ultimate penalty determination. (*People v. Capers, supra*, 7 Cal.5th at p. 1014; *People v. Rangel, supra*, 62 Cal.4th at p. 1235.) And we have concluded that *Hurst* does not cause us to reconsider our holdings that imposition of the death penalty does not constitute an increased sentence within the meaning of *Apprendi, supra*, 530 U.S. 466, or that the imposition of the death penalty does not require factual findings within the meaning of *Ring v. Arizona* (2002) 536 U.S. 584. (*People v. Henriquez* (2017) 4 Cal.5th 1, 46.) As McDaniel

acknowledges, neither *Ring* nor *Hurst* decided the standard of proof that applies to the ultimate weighing consideration.

"Use in the sentencing factors of such adjectives as 'extreme' (§ 190.3, factors (d), (g)) and 'substantial' (*id.*, factor (g)) does not act as a barrier to the consideration of mitigating evidence in violation of the federal Constitution." (*People v. Avila* (2006) 38 Cal.4th 491, 614–615.) "By advising that a death verdict should be returned only if aggravation is 'so substantial in comparison with' mitigation that death is 'warranted,' " CALJIC No. 8.88 "clearly admonishes the jury to determine whether the balance of aggravation and mitigation makes death the appropriate penalty." (*People v. Arias* (1996) 13 Cal.4th 92, 171.) "[T]he phrase ' "so substantial" ' in CALJIC No. 8.88 is not unconstitutionally vague." (*People v. Henriquez, supra*, 4 Cal.5th at p. 46.)

A trial court need not delete inapplicable statutory sentencing factors in CAJIC No. 8.85 from the jury instructions (*People v. Cook* (2006) 39 Cal.4th 566, 610) or instruct that the jury can consider certain statutory factors only in mitigation. (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 671 (*Beck and Cruz*).)

CALJIC 8.88 "clearly stated that the death penalty could be imposed only if the jury found that the aggravating circumstances outweighed mitigating. There was no need to additionally advise the jury of the converse . . . ." (*People v. Duncan* (1991) 53 Cal.3d 955, 978.)

We decline to reconsider our precedent holding that a jury cannot consider sympathy for a defendant's family in mitigation. (*People v. Rices* (2017) 4 Cal.5th 49, 88; *People v. Ochoa* (1998) 19 Cal.4th 353, 456.) The trial court need not instruct that there

is a presumption of life. (*Beck and Cruz, supra*, 8 Cal.5th at p. 670.)

"The absence of a requirement of intercase proportionality review does not violate the Eighth Amendment." (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 929.) "The California sentencing scheme does not violate the equal protection clause of the Fourteenth Amendment by denying capital defendants certain procedural safeguards afforded to noncapital defendants." (*Ibid*.) "California law does not violate international norms, and thus contravene the Eighth and Fourteenth Amendments, by imposing the death penalty as regular punishment for substantial numbers of crimes." (*Ibid*.)

### E. Cumulative Error

McDaniel contends that the cumulative effect of errors at the guilt and penalty phase requires reversal. While we assumed that admission of Anderson's cancer was error, we concluded there was no reasonable possibility that the victim impact testimony affected the verdict. There are no other errors to cumulate.

## CONCLUSION

We affirm the judgment.

**LIU, J.**


**We Concur:**
**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

PEOPLE v. McDANIEL

S171393

Concurring Opinion by Justice Liu

Over the years, this court has repeatedly rejected the claim that California's death penalty scheme violates the jury trial right guaranteed by the Sixth Amendment to the United States Constitution as interpreted in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and related cases. We do so again today, adhering to precedent. (Maj. opn., *ante*, at pp. 76–77.) I write separately, however, to express doubts about the way our case law has resolved a key facet of this claim. There is a serious question whether our capital sentencing scheme is unconstitutional in light of *Apprendi*, and I have come to believe the issue merits reexamination by this court and other responsible officials.

In *Apprendi*, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi*, *supra*, 530 U.S. at p. 490.) This holding spawned a major shift in Sixth Amendment jurisprudence, and the high court has been continually elaborating its far-reaching ramifications over the past 20 years. (See *Ring v. Arizona* (2002) 536 U.S. 584 (*Ring*); *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*); *U.S. v. Booker* (2005) 543 U.S. 220 (*Booker*); *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*); *Alleyne v. United States* (2013) 570 U.S. 99 (*Alleyne*); *Hurst v. Florida* (2016) 577 U.S. 92

1

(*Hurst*).)  Many decisions, including several of the high court's own precedents, have been overruled in *Apprendi*'s wake.

Our case law has held that the *Apprendi* rule does not disturb California's death penalty scheme.  Yet our decisions in this area consist of brief analyses that have largely addressed high court opinions one by one as they have appeared on the books.  In my view, we have not fully grappled with the analytical underpinnings of the *Apprendi* rule and the totality of the high court's 20-year line of decisions.

The high court has made clear that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*"  (*Blakely*, *supra*, 542 U.S. at p. 303, italics in original.)  Our precedent has repeatedly asserted that a defendant becomes eligible for the death penalty upon a conviction for first degree murder and a jury's true finding of one or more special circumstances.  (See, e.g., *People v. Anderson* (2001) 25 Cal.4th 543, 589–590, fn. 14 (*Anderson*) ["[U]nder the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense . . . ."]; *People v. Ochoa* (2001) 26 Cal.4th 398, 454 (*Ochoa*) ["[O]nce a jury has determined the existence of a special circumstance, the defendant stands convicted of an offense whose maximum penalty is death. . . . Accordingly, *Apprendi* does not restrict the sentencing of California defendants who have already been convicted of special circumstance murder."].)

But this assertion, in the context of *Apprendi*, appears incorrect.  Under our death penalty scheme, "the maximum

sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*" (*Blakely, supra,* 542 U.S. at p. 303) upon a conviction for first degree murder and special circumstance true finding — with nothing more — is life imprisonment without parole. A death verdict is authorized only when the penalty jury has unanimously determined that "the aggravating circumstances outweigh the mitigating circumstances" (Pen. Code, § 190.3; see *People v. Brown* (1985) 40 Cal.3d 512, 541–542, fn. 13, revd. on other grounds *sub nom. California v. Brown* (1987) 479 U.S. 538) — which necessarily presupposes that the penalty jury has found at least one section 190.3 circumstance to be aggravating. (All undesignated statutory references are to the Penal Code.) Our cases have not satisfactorily explained why this additional finding of at least one aggravating factor, which is a necessary precursor to the weighing determination and is thus required for the imposition of a death sentence, is not governed by the *Apprendi* rule.

This issue is not a mere technicality. The *Apprendi* rule states what the Constitution requires in the context of criminal sentencing, and it has particular significance in cases where the special circumstance findings by the guilt jury are not necessarily aggravating. In such cases, the prosecution may rely on a bevy of prior criminal conduct under section 190.3, factors (b) and (c), some of which may be disputed, to show aggravation during the penalty trial. For example, the prosecution here introduced evidence of 10 prior criminal acts by McDaniel under factor (b), ranging from threatening a school official and instances of weapon possession to battery of peace officers and prior instances of robbery, shooting, and killing. Some of the evidence was vigorously contested by McDaniel, and

only one prior act — possession of an assault weapon — was accompanied by documentary evidence of a conviction under factor (c).

Especially where it is not clear that any special circumstance findings by the guilt jury are aggravating at the penalty phase, section 190.3, factor (b) or (c) evidence may prove critical to the sentencing decision. It is true that each penalty juror may consider evidence of prior criminal activity as an aggravating factor only if the juror is "convinced beyond a reasonable doubt" that the defendant committed the prior crime. (*People v. Polk* (1965) 63 Cal.2d 443, 451; see *People v. McClellan* (1969) 71 Cal.2d 793, 804–806.) Yet the penalty jury "as a whole need not find any one aggravating factor to exist." (*People v. Snow* (2003) 30 Cal.4th 43, 126, fn. 32 (*Snow*).)

To illustrate: Suppose the prosecution introduces evidence of three prior criminal acts (A, B, and C). Some jurors may find that A was proven beyond a reasonable doubt, but not B and C; other jurors may find B proven, but not A and C; others may find C proven, but not A and B; and still others may find none proven at all and instead find some other circumstance to be aggravating. Or the jurors may find various prior crimes proven beyond a reasonable doubt but differ as to which one or ones are aggravating. There is little downside for the prosecution to provide a broad menu of aggravating evidence for the penalty jury to consider, since we presume on appeal that "any hypothetical juror whom the prosecution's evidence might not have convinced beyond a reasonable doubt . . . followed the court's instruction to disregard the evidence." (*People v. Yeoman* (2003) 31 Cal.4th 93, 132–133.) Our capital sentencing scheme allows the penalty jury to render a death verdict in these circumstances. But I am doubtful the Sixth Amendment does.

In the case before us, McDaniel raises some Sixth Amendment and *Apprendi* arguments, but this portion of his briefing focuses primarily on his state law claims. His *Apprendi* arguments mostly mirror his state law arguments or emphasize that the penalty jury's weighing determination is a factual issue subject to *Apprendi*. Those arguments are different from my focus here: the finding by the penalty jury of at least one aggravating factor relevant to the sentencing determination. Although today's decision does not revisit this issue, I believe the issue should be reexamined in a case where it is more fully developed. The constitutionality of our death penalty scheme in light of two decades of evolving Sixth Amendment jurisprudence deserves careful and thorough reconsideration.

## I.

"The Sixth Amendment provides that those 'accused' of a 'crime' have the right to a trial 'by an impartial jury.' This right, in conjunction with the Due Process Clause, requires that each element of a crime be proved to the jury beyond a reasonable doubt." (*Alleyne, supra,* 570 U.S. at p. 104.) To convict a defendant of a serious offense, the jury's verdict must be unanimous. (See *Ramos v. Louisiana* (2020) 590 U.S. __, __ [140 S.Ct. 1390, 1397].)

In the 20 years since *Apprendi*, the high court's precedents in this area, individually and as a whole, have underscored how robust and far-reaching the *Apprendi* rule is. As noted, *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi, supra,* 530 U.S. at p. 490.) *Apprendi* involved a plea agreement for multiple felonies arising from the defendant's "fir[ing of] several

.22-caliber bullets into the home of an African-American family that had recently moved into a previously all-white neighborhood." (*Id.* at p. 469.) To evaluate a hate crime sentencing enhancement that carried an extended term of imprisonment, the trial judge held an evidentiary hearing on the defendant's intent and "concluded that the evidence supported a finding 'that the crime was motivated by racial bias.' " (*Id.* at p. 471.) Because this subsequent factfinding by the judge under a preponderance of the evidence standard increased the maximum sentence, the high court held that this scheme violated the Sixth Amendment. (*Id.* at p. 491.) The high court's inquiry into whether a particular fact increases the penalty for a crime beyond the prescribed statutory maximum was functional in nature; it disregarded whether the fact is formally considered an element of the crime or a sentencing factor, since "[m]erely using the label 'sentence enhancement' . . . surely does not provide a principled basis for" distinction. (*Id.* at p. 476.) *Apprendi* also preserved "a narrow exception to the general rule" for the fact of a prior conviction but noted "it is arguable" that allowing the exception is "incorrect[]" based on *Apprendi*'s reasoning, at least "if the recidivist issue were contested." (*Apprendi*, at pp. 489–490; see *id.* at pp. 487–490 [declining to overrule *Almendarez-Torres v. U.S.* (1998) 523 U.S. 224, the source of the exception].)

A few years later, the high court clarified in *Blakely* "that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* [Citations.] In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any

additional findings." (*Blakely*, *supra*, 542 U.S. at pp. 303–304.) This is so because "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment.' " (*Id.* at p. 304.) *Blakely* found a Sixth Amendment violation because the defendant "was sentenced to more than three years above the 53-month statutory maximum of the standard range because he had acted with 'deliberate cruelty,' " and the judge "could not have imposed" that "sentence solely on the basis of the facts admitted in the guilty plea." (*Id.* at pp. 303–304.)

In *Booker*, the Supreme Court applied *Apprendi* to the federal sentencing guidelines, holding that the trial judge's additional factfinding violated the Sixth Amendment when it resulted in "an enhanced sentence of 15 or 16 years [under the guidelines] instead of the 5 or 6 years authorized by the jury verdict alone." (*Booker*, *supra*, 543 U.S. at p. 228; see *id.* at pp. 233–235.)

In *Cunningham*, the high court considered California's determinate sentencing law, which "assign[ed] to the trial judge, not to the jury, authority to find the facts that expose a defendant to an elevated 'upper term' sentence." (*Cunningham*, *supra*, 549 U.S. at p. 274.) The scheme specified three precise terms (lower, middle, and upper) and directed the trial court "to start with the middle term, and to move from that term only when the court itself finds and places on the record facts — whether related to the offense or the offender — beyond the elements of the charged offense" and " 'established by a preponderance of the evidence.' " (*Id.* at pp. 277, 279.) Because "[t]he facts so found are neither inherent in the jury's verdict nor embraced by the defendant's plea, and they need only be established by a preponderance of the evidence, not beyond a

reasonable doubt," the high court held that this scheme violated the Sixth and Fourteenth Amendments.  (*Id.* at p. 274.)

The Supreme Court has also applied the *Apprendi* rule to capital sentencing.  In *Ring*, the high court considered Arizona's scheme, in which a defendant "could not be sentenced to death, the statutory maximum penalty for first-degree murder, unless further findings were made." (*Ring*, *supra*, 536 U.S. at p. 592.) State law required the trial judge "to 'conduct a separate sentencing hearing to determine the existence or nonexistence of [certain enumerated] circumstances . . . for the purpose of determining the sentence to be imposed' " and permitted "the judge to sentence the defendant to death only if there [wa]s at least one aggravating circumstance and . . . 'no mitigating circumstances sufficiently substantial to call for leniency.' " (*Id.* at pp. 592–593.)  The high court, before *Apprendi*, had upheld Arizona's scheme under the Sixth and Eighth Amendments (*Walton v. Arizona* (1990) 497 U.S. 639 (*Walton*)), and the high court in *Apprendi* left *Walton*'s Sixth Amendment holding undisturbed (*Apprendi*, *supra*, 530 U.S. at pp. 496–497). "The key distinction, according to the *Apprendi* Court, was that a conviction of first-degree murder in Arizona carried a maximum sentence of death.  'Once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed.' " (*Ring*, at p. 602.)  But two years after *Apprendi*, the high court reversed itself, holding in *Ring* that this distinction was untenable and inconsistent with the Arizona Supreme Court's own construction of the state's capital sentencing law.  (*Id.* at p. 603.)  *Ring* thus overruled *Walton*'s Sixth Amendment holding.  (*Id.* at p. 609.)

In *Ring*, the state argued that because "Arizona law specifies 'death or life imprisonment' as the only sentencing options" for a first degree murder conviction, "Ring was therefore sentenced within the range of punishment authorized by the jury verdict." (*Ring*, *supra*, 536 U.S. at pp. 603–604.) The high court rejected this argument, explaining that it "overlook[ed] *Apprendi*'s instruction that 'the relevant inquiry is one not of form, but of effect.' " (*Id.* at p. 604.) The "first-degree murder statute 'authorize[d] a maximum penalty of death only in a formal sense,' " *Ring* explained, because the finding of at least one aggravating circumstance at the sentencing phase is required for a death sentence. (*Ibid.*) "In effect, 'the required finding [of an aggravated circumstance] expose[d] [Ring] to a greater punishment than that authorized by the jury's guilty verdict' " alone. (*Ibid.*) *Ring* thus made clear that if "a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact — no matter how the State labels it — must be found by a jury beyond a reasonable doubt." (*Id.* at p. 602.) Further, "[a]ggravators 'operate as statutory "elements" of capital murder . . . [when,] in their absence, [the death] sentence is unavailable.' " (*Id.* at p. 599, quoting *Walton*, *supra*, 497 U.S. at p. 709, fn.1 (dis. opn. of Stevens, J.).) *Ring* also recognized that *Walton*'s distinction "between elements of an offense and sentencing factors" was "untenable" in light of *Apprendi*. (*Ring*, at p. 604.)

More recently, in *Hurst*, the high court applied *Apprendi* and its progeny to a state capital sentencing scheme it had twice upheld under the Sixth Amendment. (*Hurst*, *supra*, 577 U.S. at p. 101, overruling *Hildwin v. Florida* (1989) 490 U.S. 638 (*Hildwin*) and *Spaziano v. Florida* (1984) 468 U.S. 447 (*Spaziano*).) Under Florida's death penalty scheme at the time,

a defendant convicted of a capital felony could receive a maximum sentence of life imprisonment based on the conviction alone. (*Hurst*, at p. 95.) A sentence of death required "an additional sentencing proceeding 'result[ing] in findings by the court that such person shall be punished by death.' " (*Ibid.*) Florida used a "hybrid" model " 'in which [a] jury renders an advisory verdict but the judge makes the ultimate sentencing determinations.' " (*Ibid.*, quoting *Ring, supra,* 536 U.S. at p. 608, fn. 6.) The high court found *Ring*'s analysis to "appl[y] equally to Florida's" scheme because, "[l]ike Arizona at the time of *Ring,* Florida does not require the jury to make the critical findings necessary to impose the death penalty" — instead "requir[ing] a judge to find these facts" — and "the maximum punishment [the defendant] could have received without any judge-made findings was life in prison without parole." (*Hurst*, at pp. 98–99.) Focusing again on function over form, the high court found Florida's "advisory jury verdict" to be "immaterial" for purposes of satisfying the Sixth Amendment because the jury " 'does not make specific factual findings with regard to the existence of mitigating or aggravating circumstances and its recommendation is not binding on the trial judge.' " (*Hurst*, at pp. 98–99.)

Just last year, in an Eighth Amendment case, the high court again confirmed that "[u]nder *Ring* and *Hurst,* a jury must find the aggravating circumstance that makes the defendant death eligible." (*McKinney v. Arizona* (2020) 589 U.S. __, __ [140 S.Ct. 702, 707] (*McKinney*).) At the same time, the court reaffirmed its prior decisions holding that the Constitution does not require "a jury (as opposed to a judge) . . . to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision" in a capital proceeding. (*Ibid.*)

*McKinney* also rejected the claim that it was error for the trial judge in that case, as opposed to a jury, to find the aggravating circumstance that raised the statutory maximum penalty to death; that claim could not succeed because the "case became final . . . long before *Ring* and *Hurst*" and those decisions "do not apply retroactively on collateral review." (*Id.* at p. __ [at p. 708].)

In sum, under *Apprendi* and its progeny, the Sixth Amendment requires any fact, other than the fact of a prior conviction, that increases the penalty for a crime beyond the statutory maximum to be found by a unanimous jury and proved beyond a reasonable doubt. The statutory maximum means the maximum sentence permissible based solely on the facts reflected in the jury's verdict or admitted by the defendant, without any additional factfinding. (*Blakely*, *supra*, 542 U.S. at p. 303.) It does not matter if the additional fact to be found is termed an "aggravating circumstance," a "sentencing factor," or a "sentencing enhancement"; the high court has emphasized that " 'the relevant inquiry is one not of form, but of effect.' " (*Ring*, *supra*, 536 U.S. at p. 604.)

## II.

True to its word, the high court has consistently elevated function over form in applying *Apprendi*. (*Apprendi*, *supra*, 530 U.S. at p. 494; see also *Ring*, *supra*, 539 U.S. at p. 602; *id.* at p. 610 (conc. opn. of Scalia, J.) ["[T]he fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives — whether the statute calls them elements of the offense, sentencing factors, or Mary Jane — must be found by the jury beyond a reasonable doubt."]; *Southern Union Co. v. U.S.* (2012) 567 U.S. 343, 358–359 ["*Apprendi* and its progeny

have uniformly rejected" the argument "that in determining the maximum punishment for an offense, there is a constitutionally significant difference between a fact that is an 'element' of the offense and one that is a 'sentencing factor.' "].) The high court has repeatedly looked past statutory labels to determine the substantive role that a fact or factor plays in the sentencing decision.

As noted, this approach has led the high court to overrule several of its precedents. *Walton* upheld capital sentencing schemes that "requir[e] judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death." (*Apprendi*, *supra*, 530 U.S. at p. 496.) *Apprendi* reaffirmed *Walton*, but in *Ring*, the high court found *Walton* untenable in light of *Apprendi* and overruled it. (*Ring*, *supra*, 536 U.S. at pp. 604–605, 609.) In *Hurst*, the high court overruled *Spaziano* and *Hildwin* as inconsistent with *Apprendi*. (*Hurst*, *supra*, 577 U.S. at p. 102.) And in *Alleyne*, the high court held that any fact that increases the statutory minimum penalty must also be found by a jury beyond a reasonable doubt, overruling *Harris v. U.S.* (2002) 536 U.S. 545, 557 and *McMillan v. Pennsylvania* (1986) 477 U.S. 79. (*Alleyne*, *supra*, 570 U.S. at p. 103; see *United States v. Haymond* (2019) 588 U.S. __, __ [139 S.Ct. 2369, 2378].) These overrulings indicate the breadth and force of the *Apprendi* rule.

The high court's decisions have also made clear that the requirements of the Sixth and Eighth Amendments are distinct. After initially holding in *Walton* that Arizona's capital sentencing scheme complied with both the Sixth and Eighth Amendments, and then overruling *Walton*'s Sixth Amendment holding in *Ring*, the high court left intact *Walton*'s Eighth Amendment holding that "the challenged factor . . . furnishes

sufficient guidance to the sentencer" and thus did not violate the Eighth Amendment. (*Walton, supra,* 497 U.S. at p. 655; see *Kansas v. Marsh* (2006) 548 U.S. 163, 169.) The high court has understood the Eighth Amendment to be fundamentally concerned with narrowing a sentencer's discretion to ensure that punishment is commensurate and proportional to the offense. (See *Graham v. Florida* (2010) 560 U.S. 48, 59; *Maynard v. Cartwright* (1988) 486 U.S. 356, 362.) The Sixth Amendment, by contrast, ensures that the facts necessary for a criminal punishment are found by a unanimous jury and proved beyond a reasonable doubt. In light of these different inquiries under the Sixth and Eighth Amendments, a scheme that satisfies one does not necessarily satisfy the other. (See *Ring, supra,* 539 U.S. at p. 606 ["The notion 'that the Eighth Amendment's restriction on a state legislature's ability to define capital crimes should be compensated for by permitting States more leeway under the Fifth and Sixth Amendments in proving an aggravating fact necessary to a capital sentence . . . is without precedent in our constitutional jurisprudence.' "].)

The high court's evolving jurisprudence has also caused state courts to reexamine earlier decisions. "Following *Apprendi,*" the Hawaii Supreme Court "repeatedly considered whether Hawaii's extended term sentencing scheme comported with *Apprendi.* Until 2007, [the court] concluded that it did so, on the ground that Hawaii's scheme only required the judge to determine 'extrinsic' facts, rather than facts that were 'intrinsic' to the offense. [Citations.] It was not until *Maugaotega II,* that th[e] court acknowledged that the United States Supreme Court, in *Cunningham,* rejected the validity of [Hawaii's] intrinsic/extrinsic distinction, which formed the basis of these decisions. [*State v. Maugaotega* (Hawaii 2007) 168 P.3d 562,

572–577].” (*Flubacher v. State* (Hawaii 2018) 414 P.3d 161, 167.)

The Delaware Supreme Court had repeatedly held that the state's death penalty scheme complied with *Apprendi* and its progeny. (See *McCoy v. State* (Del. 2015) 112 A.3d 239, 269–271; *Swan v. State* (Del. 2011) 28 A.3d 362, 390–391; *Brice v. State* (Del. 2003) 815 A.2d 314, 321–322.) After *Hurst*, the court changed course and held that Delaware's law violates the Sixth Amendment's requirement that “the existence of 'any aggravating circumstance,' statutory or non-statutory, that has been alleged by the State for weighing in the selection phase of a capital sentencing proceeding must be made by a jury, . . . unanimously and beyond a reasonable doubt.” (*Rauf v. State* (Del. 2016) 145 A.3d 430, 433–434; see *id.* at p. 487, fn. omitted (conc. opn. of Holland, J.) [*Hurst* squarely “invalidated a judicial determination of aggravating circumstances” and “also stated unequivocally that the jury trial right recognized in *Ring* now applies to *all* factual findings *necessary* to impose a death sentence under a state statute”].)

The Florida Supreme Court, on remand after *Hurst*, concluded that the Sixth Amendment requires the jury to “be the finder of every fact, and thus every element, necessary for the imposition of the death penalty.” (*Hurst v. State* (Fla. 2016) 202 So.3d 40, 53.) “These necessary facts include . . . find[ing] the existence of the aggravating factors proven beyond a reasonable doubt, that the aggravating factors are sufficient to impose death, and that the aggravating factors outweigh the mitigating circumstances.” (*Ibid.*, fn. omitted.) Noting that “Florida law has long required findings beyond the existence of a single aggravator before the sentence of death may be recommended or imposed,” the court “reject[ed] the State's

argument that *Hurst v. Florida* only requires that the jury unanimously find the existence of one aggravating factor and nothing more." (*Id.* at p. 53, fn. 7.) The court "also conclude[d] that, just as elements of a crime must be found unanimously by a Florida jury, all these findings . . . are also elements that must be found unanimously by the jury." (*Id.* at pp. 53–54.)

More recently, the Florida Supreme Court "partially recede[d]" from its holding on remand from *Hurst.* (*State v. Poole* (Fla. 2020) 297 So.3d 487, 501 (*Poole*).) In *Poole*, the court distinguished between the two findings required during the state's sentencing phase: (a) "[t]he eligibility finding . . . '[t]hat sufficient aggravating circumstances exist'"; and (b) "[t]he selection finding . . . '[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances.'" (*Id.* at p. 502, quoting Fla. Stat. § 921.141.) The court determined that the selection or weighing finding "'is mostly a question of mercy'" and "'is not a finding of fact [to which the jury trial right attaches], but a moral judgment.'" (*Poole*, at p. 503; cf. *McKinney, supra,* 589 U.S. at pp. __–__ [140 S.Ct. at pp. 707–708].) However, and most relevant here, the court did not disturb its prior holding that the jury must find "one or more statutory aggravating circumstances" unanimously and beyond a reasonable doubt. (*Ibid.*)

Moreover, many state legislatures have responded to *Apprendi* and its progeny in the capital context and, especially after *Blakely*, more broadly in criminal sentencing. (See Stemen & Wilhelm, Finding the Jury: State Legislative Responses to *Blakely v. Washington* (2005) 18 Fed. Sentencing Rep. 7 [providing an overview of state reforms].) Immediately after *Ring*, Arizona enacted statutory changes conforming its death penalty scheme to *Ring*'s requirements. Arizona law now

provides for two phases of the capital sentencing proceeding: (1) the aggravation phase, in which "the trier of fact . . . determine[s] whether one or more alleged aggravating circumstances have been proven" (Ariz. Rev. Stat., § 13-752(C)); and (2) the penalty phase, in which "the trier of fact . . . determine[s] whether the death penalty should be imposed" (*id.*, subd. (D)). In the aggravation phase, the jury must "make a special finding on whether each alleged aggravating circumstance has been proven" (*id.*, subd. (E)); "a unanimous verdict is required to find that the aggravating circumstance has been proven" (*ibid.*); and "[t]he prosecution must prove the existence of the aggravating circumstances beyond a reasonable doubt" (*id.* § 13-751(B)). Then, in the penalty phase, the jury considers "any evidence that is relevant to the determination of whether there is mitigation that is sufficiently substantial to call for leniency" (*id.* § 13-752(G)), and the defendant has the burden of "prov[ing] the existence of the mitigating circumstances by a preponderance of the evidence" (*id.* § 13-751(C)). Jurors "do not have to agree unanimously that a mitigating circumstance has been proven to exist"; "[e]ach juror may consider any mitigating circumstance found by that juror in determining the appropriate penalty." (*Ibid.*)

Likewise, Florida enacted statutory reforms to its capital sentencing regime following *Hurst*. Florida law now requires that the jury find, "beyond a reasonable doubt, the existence of at least one aggravating factor" in order for the defendant to be eligible for the death penalty. (Fla. Stat., § 921.141(2)(a); see *id.*, subd. (2)(b)1.) The jury must also "unanimous[ly]" "return findings identifying each aggravating factor found to exist" (*id.*, subd. (2)(b)) and "[u]nanimously" recommend a sentence of either life without parole or death "based on a weighing of . . .

[¶] . . . [w]hether sufficient aggravating factors exist[,] . . . [¶] [w]hether aggravating factors exist which outweigh the mitigating circumstances found to exist[,] . . . [¶] [and, based on that], whether the defendant should be sentenced to life imprisonment without the possibility of parole or to death" (*id.*, subd. (2)(b)2.; see *id.*, subd. (c)).  Only if the jury unanimously recommends a sentence of death can the court then decide whether to "impose a sentence of life imprisonment without the possibility of parole or a sentence of death" (*id.*, subd. (3)(a)(2)) "after considering each aggravating factor found by the jury and all mitigating circumstances" (*id.*, subd. (3)(b)).

In sum, the high court's *Apprendi* jurisprudence has prompted significant reexamination and reform of capital sentencing schemes in many states.  Yet California is not among them, and our precedent is in conflict with decisions from other states.  (See *Poole, supra,* 297 So.3d at pp. 501–503 [recognizing that the state law requirement of at least one aggravating factor in order to impose death is subject to the *Apprendi* rule]; *Rauf v. State, supra,* 145 A.3d at pp. 433–434 [any aggravating circumstance used in a capital sentencing proceeding must be found by a unanimous jury beyond a reasonable doubt].)

### III.

We first confronted the impact of *Apprendi* on California's death penalty scheme in *Anderson, supra,* 25 Cal.4th 543.  In a footnote, we found *Apprendi* inapplicable to the penalty phase because "under the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death *is* no more than the prescribed statutory maximum for the offense; the only alternative is life

imprisonment without possibility of parole." (*Id.* at pp. 589–590, fn. 14.)

We elaborated on this distinction in *Ochoa,* reasoning that "*Apprendi* itself excluded from its scope 'state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death.' " (*Ochoa, supra,* 26 Cal.4th at p. 453, quoting *Apprendi, supra,* 530 U.S. at p. 496.) In *Ochoa,* we specifically relied on *Apprendi*'s reaffirmation of *Walton* and noted similarities between the California and then-current Arizona schemes. (*Ochoa,* at pp. 453–454.)

But our reliance on *Walton* was soon undercut by *Ring.* After *Ring* overruled *Walton* and found Arizona's scheme unconstitutional, we reverted to rejecting the argument that *Apprendi* "mandates that aggravating circumstances necessary for the jury's imposition of the death penalty be found beyond a reasonable doubt . . . for the reason given in *People v. Anderson, supra,* 25 Cal.4th at pages 589–590, footnote 14" (quoted above). (*Snow, supra,* 30 Cal.4th at p. 126, fn. 32.) We concluded that *Ring* "does not change this analysis" because "[u]nder California's scheme, in contrast [to Arizona's], each juror must believe the circumstances in aggravation substantially outweigh those in mitigation, but the jury as a whole need not find any one aggravating factor to exist" since "[t]he final step . . . is a free weighing of all the factors relating to the defendant's culpability, comparable to a sentencing court's traditionally discretionary decision to, for example, impose one prison sentence rather than another." (*Ibid.*) We insisted that "[n]othing in *Apprendi* or *Ring* suggests the sentencer in such a system constitutionally must find any aggravating factor true beyond a reasonable doubt." (*Ibid.*)

In *People v. Prieto* (2003) 30 Cal.4th 226, we further explained that because the penalty "jury merely weighs the factors enumerated in section 190.3 and determines 'whether a defendant eligible for the death penalty should in fact receive that sentence . . .' [citation] [n]o single factor therefore determines which penalty — death or life without the possibility of parole — is appropriate. [¶] . . . [And] [b]ecause any finding of aggravating factors during the penalty phase does not 'increase[ ] the penalty for a crime beyond the prescribed statutory maximum' [citation], *Ring* imposes no new constitutional requirements on California's penalty phase proceedings." (*Id.* at p. 263.)

We reaffirmed this reasoning after *Blakely* (see *People v. Morrison* (2004) 34 Cal.4th 698, 731 (*Morrison*)), *Booker* (see *People v. Lancaster* (2007) 41 Cal.4th 50, 106), *Cunningham* (see *People v. Prince* (2007) 40 Cal.4th 1179, 1297 (*Prince*)), and *Hurst* (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235). But in each instance, our analysis was brief, ranging from a few sentences to a short paragraph or two. And we relied more on grounds for distinguishing the sentencing schemes at issue in the high court's opinions than on any thorough examination of the analytical underpinnings of the *Apprendi* line of decisions.

For instance, despite *Blakely*'s clarification of what "the 'statutory maximum' for *Apprendi* purposes" means — i.e., "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*" (*Blakely*, *supra*, 542 U.S. at p. 303) — we concluded that *Blakely* "d[id] not undermine our analysis" because it "simply relied on *Apprendi* and *Ring* to conclude that a state noncapital criminal defendant's Sixth Amendment right to trial by jury was violated where the facts supporting his sentence, which was above the

standard range for the crime he committed, were neither admitted by the defendant nor found by a jury to be true beyond a reasonable doubt" (*Morrison, supra,* 34 Cal.4th at p. 731). We distinguished *Cunningham* on the ground that it "involve[d] merely an extension of the *Apprendi* and *Blakely* analyses to California's determinate sentencing law and has no apparent application to the state's capital sentencing scheme." (*Prince, supra,* 40 Cal.4th at p. 1297.)

And we distinguished *Hurst* on the ground that under California's sentencing scheme, unlike Florida's, "a jury weighs the aggravating and mitigating circumstances and reaches a unanimous penalty verdict" and "this verdict is not merely 'advisory.'" (*Rangel, supra,* 62 Cal.4th at p. 1235, fn. 16, quoting *Hurst, supra,* 577 U.S. at p. 98.) We explained that "[i]f the jury reaches a verdict of death, our system provides for an automatic motion to modify or reduce this verdict to that of life imprisonment without the possibility of parole," but the trial court "rules on this motion . . . simply [to] determine[] 'whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented.'" (*Rangel,* at p. 1235, fn. 16, quoting § 190.4; see *People v. Capers* (2019) 7 Cal.5th 989, 1014 [reaffirming this same reasoning to distinguish *Hurst*].)

These analyses in our case law appear to rest on the observation that under California's capital sentencing scheme, "the jury as a whole need not find any one aggravating factor to exist." (*Snow, supra,* 30 Cal.4th at p. 126, fn. 32.) Thus, when the prosecution offers evidence of multiple instances of prior criminal conduct as aggravating evidence in support of a death verdict, the jury need not agree on which prior crimes, if any,

have been proven beyond a reasonable doubt. Two jurors may find the existence of one prior crime, while three other jurors may focus on another prior crime, a single juror may fixate on still another or none at all, and so on. Yet our case law deems the jury as a whole to have found the existence of at least one aggravating factor so long as each juror finds one (*any* one) prior crime proven beyond a reasonable doubt — or none at all so long as the juror finds another section 190.3 factor to be aggravating.

The observation that this is how California's sentencing scheme works is not an argument for its constitutionality under *Apprendi*. Under section 190.3, the penalty jury may not return a death verdict unless it has found at least one aggravating circumstance. It is not clear why that finding is not governed by the *Apprendi* rule. We have compared the jury's "free weighing" of aggravating and mitigating circumstances in the penalty determination to "a sentencing court's traditionally discretionary decision." (*Snow*, *supra*, 30 Cal.4th at p. 126, fn. 32.) But it is precisely the sentencing court's traditional discretion that the *Apprendi* rule upends, cabining it to a prescribed statutory range supported by proper jury findings. (See *Cunningham*, *supra*, 549 U.S. at p. 292; *McKinney*, *supra*, 589 U.S. at pp. \_\_–\_\_ [140 S.Ct. at pp. 707–708].) To say that California law does not require the jury to agree on any one aggravating factor does not answer the *Apprendi* claim; it simply states the problem.

Our repeated insistence that death is no more than the statutory maximum upon a first degree murder conviction and a true finding of a special circumstance also cannot carry the day. The same argument — made by this court in the analogous context of determinate sentencing — was considered and rejected in *Cunningham*. Before *Cunningham*, we upheld

California's determinate sentencing law under *Apprendi*, *Blakely*, and *Booker*. (See *People v. Black* (2005) 35 Cal.4th 1238, 1254 (*Black*), judg. vacated and cause remanded for further consideration in light of *Cunningham, supra,* 549 U.S. 270, *sub nom. Black v. California* (2007) 549 U.S. 1190.) In *Black*, we rejected the argument that "a jury trial [wa]s required on the aggravating factors on which an upper term sentence is based, because the middle term is the 'maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict . . . .'" (*Black*, at p. 1254, italics omitted, quoting *Blakely, supra,* 542 U.S. at p. 303.) We explained that "the California determinate sentence law simply authorize[s] a sentencing court to engage in the type of factfinding that traditionally has been incident to the judge's selection of an appropriate sentence within a statutorily prescribed sentencing range." (*Ibid.*) We held that the "the upper term is the 'statutory maximum'" and viewed the statutory "requirement that the middle term be imposed unless an aggravating factor is found" as "merely a requirement that the decision to impose the upper term be *reasonable*," "preserv[ing] the traditional broad range of judicial sentencing discretion." (*Id.* at pp. 1254–1255, fn. omitted.) We also analogized the determinate sentencing law to "the post-*Booker* federal sentencing system." (*Id.* at p. 1261.)

Notwithstanding our understanding of California's determinate sentencing law, the high court in *Cunningham* rejected our reasoning in *Black*. The high court concluded that "[i]f the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied." (*Cunningham, supra,* 549 U.S. at p. 290.) *Cunningham* also rejected *Black*'s comparison to the advisory

federal sentencing guidelines because under California's sentencing scheme "judges are not free to exercise their 'discretion to select a specific sentence within a defined range.' " (*Id.* at p. 292, quoting *Booker, supra,* 543 U.S. at p. 233.) Rather, by "adopt[ing] sentencing triads, three fixed sentences with no ranges between them," judges have "no discretion to select a sentence within a range." (*Cunningham,* at p. 292.) Instead, a judge must impose the middle term absent "[f]actfinding to elevate a sentence," and *Cunningham* concluded that the high court's "decisions make plain" that such factfinding "falls within the province of the jury employing a beyond-a-reasonable-doubt standard, not the bailiwick of a judge determining where the preponderance of the evidence lies." (*Ibid.*)

Our reasoning distinguishing *Apprendi* and its progeny in the capital context appears analogous to the reasoning in *Black* that *Cunningham* rejected. We have said that "death *is* no more than the prescribed statutory maximum" upon a special circumstance first degree murder conviction (*Anderson, supra,* 25 Cal.4th at pp. 589–590, fn. 14), and we have emphasized the jury's "free weighing" penalty determination to conclude that it is equivalent to "a sentencing court's traditionally discretionary decision" (*Snow, supra,* 30 Cal.4th at p. 126, fn. 32). But just as the determinate sentencing law in *Cunningham* prescribed "sentencing triads" with three discrete options as opposed to allowing a judge to select " 'within a defined range' " (*Cunningham, supra,* 549 U.S. at p. 292), California's capital sentencing scheme similarly provides for two discrete options in the case of a conviction for first degree murder with a special circumstance finding — "death or imprisonment in the state prison for life without the possibility of parole" (§ 190.2,

subd. (a)). And like the requirement to impose the middle term absent factfinding in aggravation, in the capital context "a sentence of confinement in state prison for a term of life without the possibility of parole" is required unless the jury finds one or more aggravating circumstances and "concludes that the aggravating circumstances outweigh the mitigating circumstances." (§ 190.3.)

After the high court vacated *Black* and remanded for further consideration in light of *Cunningham*, we decided *People v. Black* (2007) 41 Cal.4th 799 (*Black II*). We rejected the argument that there is a "right to jury trial on all aggravating circumstances that may be considered by the trial court, even if one aggravating circumstance has been established in accordance with *Blakely*." (*Id.* at p. 814.) Instead, we held that "as long as a single aggravating circumstance that renders a defendant *eligible* for the upper term sentence has been established in accordance with the requirements of *Apprendi* and its progeny, any additional fact finding engaged in by the trial court in selecting the appropriate sentence among the three available options does not violate the defendant's right to jury trial." (*Id.* at p. 812.)

We reasoned that "*Cunningham* requires us to recognize that aggravating circumstances serve two analytically distinct functions in California's current determinate sentencing scheme. One function is to raise the maximum permissible sentence from the middle term to the upper term. The other function is to serve as a consideration in the trial court's exercise of its discretion in selecting the appropriate term from among those authorized for the defendant's offense. Although the [determinate sentencing law] does not distinguish between these two functions, in light of *Cunningham* it is now clear that

we must view the federal Constitution as treating them differently. Federal constitutional principles provide a criminal defendant the right to a jury trial and require the prosecution to prove its case beyond a reasonable doubt as to factual determinations (other than prior convictions) that serve the first function, but leave the trial court free to make factual determinations that serve the second function. It follows that imposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions." (*Black II*, *supra*, 41 Cal.4th at pp. 815–816.)

The continued applicability of this part of *Black II* is not clear in light of statutory changes to the determinate sentencing law made in response to *Cunningham*. (See Stats. 2007, ch. 3, § 2; § 1170, subd. (b).) Even so, and despite our conclusion that *Cunningham* "has no apparent application to the state's capital sentencing scheme" (*Prince*, *supra*, 40 Cal.4th at p. 1297), there is an argument for extending *Black II*'s reasoning to the jury's consideration of aggravating and mitigating circumstances in the capital context under section 190.3. But, as I explain, them argument is not convincing.

Under *Black II*, one could argue that our death penalty scheme comports with *Apprendi* as follows: A jury must find at least one special circumstance under section 190.2 for the defendant to be death-eligible and for the proceeding to continue into a penalty phase, and that special circumstance must be found unanimously and beyond a reasonable doubt. (§ 190.1.) Then, any such special circumstance found true by the guilt phase jury automatically becomes a consideration for the

penalty phase jury under section 190.3, factor (a), since that factor includes "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1." Thus, in light of the guilt phase jury's special circumstance finding(s), the structure of our death penalty scheme arguably ensures at least "one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions." (*Black II*, *supra*, 41 Cal.4th at p. 816.)

However, nothing in our case law has applied *Black II*'s reasoning in this manner, and we have not characterized a special circumstance finding as an aggravating factor or specifically cited section 190.3, factor (a) in this context. Instead, we have reasoned (unpersuasively in my view) that the special circumstance finding means "death is no more than the prescribed statutory maximum for the offense" upon conviction at the guilt phase, and "[h]ence, facts which bear upon, but do not necessarily determine, which of the[] two alternative penalties [i.e., death or life imprisonment without the possibility of parole] is appropriate do not come within the holding of *Apprendi*." (*Anderson*, *supra*, 25 Cal.4th at pp. 589–590, fn. 14, italics omitted; see *Ochoa*, *supra*, 26 Cal.4th at p. 454.) We have also observed that "[t]he literal language of [factor] (a) presents a theoretical problem . . . , since it tells the penalty jury to consider the 'circumstances' of the capital crime *and* any attendant statutory 'special circumstances[,]' . . . [and] the latter are a subset of the former, [so] a jury given no clarifying instructions might conceivably double-count any 'circumstances' which were also 'special circumstances.'" (*People v. Melton* (1988)

44 Cal.3d 713, 768.) In *Melton*, we held that when requested "the trial court should admonish the jury not to do so." (*Ibid.*; see *People v. Monterroso* (2004) 34 Cal.4th 743, 789–790.) Applying *Black II*'s rationale in the manner described above would conceive of the special circumstance finding as serving multiple functions, in tension with our holding in *Melton*.

Moreover, the structure of our death penalty statute presents a problem for extending *Black II* in the manner above. Whereas states like Arizona and Florida statutorily enumerate a specific list of factors that, if found to exist by the jury, have been deemed per se aggravating, section 190.3 takes a different approach: It enumerates a *combined* list of *potentially* relevant factors and leaves it to the penalty phase jury to determine whether, in a given case, each individual factor is aggravating, mitigating, or irrelevant for sentencing selection. (See § 190.3 [the penalty jury "shall take into account any of the following factors *if relevant*" (italics added)].) Nothing in our death penalty scheme deems a special circumstance to be per se aggravating. Instead, section 190.3 leaves it to the penalty jury to determine whether "the existence of any special circumstances found to be true" is an aggravating factor "relevant" to the penalty determination. (§ 190.3, factor (a).)

The penalty jury's finding in this regard — i.e., whether the existence of a special circumstance is aggravating and thus "relevant" to the penalty determination (§ 190.3) — is not dissimilar from other determinations that, though arguably normative or moral in nature as opposed to purely factual, are nonetheless governed by the *Apprendi* rule. For example, *Blakely* involved a finding in aggravation of " 'deliberate cruelty' " to support the more severe sentence that was imposed. (*Blakely*, *supra*, 542 U.S. at p. 303.) The high court concluded

that "[w]hether the judge's authority to impose an enhanced sentence depends on finding a specified fact (as in *Apprendi*), one of several specified facts (as in *Ring*), or any aggravating fact (as here [in *Hurst*]), it remains the case that the jury's verdict alone does not authorize the sentence." (*Id.* at p. 305.) *Hurst* likewise applied the *Apprendi* rule to an aggravating circumstance finding that the capital crime was " 'heinous, atrocious, or cruel' " (*Hurst, supra,* 577 U.S. at p. 96) — a common aggravating factor in many state statutes (see, e.g., *Clemons v. Mississippi* (1990) 494 U.S. 738, 743, fn. 1; Ala. Code, § 13A-5-49(8); N.C. Gen. Stat. Ann., § 15A-2000(e)(9); Okla. Stat. Ann., tit. 21, § 701.12(4)).

Thus, in contrast to the statutory regimes in other states, a special circumstance finding under our scheme does not mean the jury has found the existence of the special circumstance to be aggravating — and that is the crucial determination needed at the penalty phase. By expressly leaving this determination to the penalty jury, our statutory scheme does not treat a special circumstance found true at the guilt phase to be a per se aggravating factor relevant to the sentencing decision. If the existence of a special circumstance forms no part of the jury's calculus in weighing aggravating and mitigating circumstances, then it cannot satisfy *Black II*'s requirement that at least "one legally sufficient aggravating circumstance has been found to exist by the jury." (*Black II, supra,* 41 Cal.4th at p. 816; see *Ring, supra,* 536 U.S. at p. 604 [" 'the relevant inquiry is one not of form, but of effect' "].)

This concern is hardly speculative. The list of special circumstances in section 190.2 is broad and includes a number of circumstances, such as commission of murder during a burglary or robbery, that do not seem necessarily aggravating

in every case.  As just one example, consider *People v. Yeoman*, *supra*, 31 Cal.4th 93, which involved a first degree murder conviction and a robbery-murder special circumstance true finding arising from the robbery and killing of an elderly female motorist whose car had broken down.  At the penalty phase, the prosecution's "evidence in aggravation consisted of the circumstances of the capital offense (§ 190.3, factor (a)), three prior felony convictions (*id.*, factor (c)) and five incidents of criminal activity involving violence or a threat of violence (*id.*, factor (b))."  (*Yeoman*, at p. 108.)  The defendant contested some of this aggravating evidence, including an earlier robbery and attempted kidnapping of another female motorist, which the prosecution also introduced at the guilt phase under Evidence Code section 1101, subdivision (b) to show intent, as well as another killing not charged in the proceeding and used only as factor (b) evidence.  Can it be said that the special circumstance finding comprised the "one legally sufficient aggravating circumstance . . . found to exist by the jury" that the *Apprendi* rule requires?  (*Black II*, *supra*, 41 Cal.4th at p. 816.)  Or did the jury instead predicate its sentencing decision on findings with regard to contested evidence under factors (b) and (c)?

There are many other cases involving robbery-murder or burglary-murder special circumstance findings where the prosecution relied on extensive evidence of prior criminal activity to show aggravation at the penalty phase.  (See, e.g., *People v. Grimes* (2016) 1 Cal.5th 698; *People v. Jackson* (2014) 58 Cal.4th 724; *People v. Abel* (2012) 53 Cal.4th 891; *People v. Friend* (2009) 47 Cal.4th 1.)  In such cases, it is hardly clear — because our death penalty scheme does not require clarity — that the jury found the existence of a special circumstance to be a "relevant" aggravating factor.  (§ 190.3.)  If the jury made no

such finding, then it is quite possible that individual jurors seized on different items in the prosecution's proffered menu of aggravating circumstances and that no single aggravating circumstance was found beyond a reasonable doubt by a unanimous jury. The *Apprendi* rule appears to foreclose a death judgment in such cases because life imprisonment without the possibility of parole is "the maximum sentence" authorized under California law at the penalty phase absent a jury finding of at least one aggravating circumstance. (*Blakely*, *supra*, 542 U.S. at p. 303.)

*     *     *

In sum, the 20-year arc of the high court's Sixth Amendment jurisprudence raises serious questions about the constitutionality of California's death penalty scheme. There is a world of difference between a unanimous jury finding of an aggravating circumstance and the smorgasbord approach that our capital sentencing scheme allows. Given the stakes for capital defendants, the prosecution, and the justice system, I urge this court, as well as other responsible officials sworn to uphold the Constitution, to revisit this issue at an appropriate time.

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. McDaniel

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S171393
**Date Filed:** August 26, 2021

_____

**Court:**  Superior
**County:** Los Angeles
**Judge:** Robert J. Perry


_____

**Counsel:**

Michael J. Hersek and Mary K. McComb, State Public Defenders, under appointments by the Supreme Court, Peter R. Silten and Elias Batchelder, Deputy State Public Defenders, for Defendant and Appellant.

Molly O'Neal, Public Defender (Santa Clara), and Michael Ogul, Deputy Public Defender, for California Public Defenders Association and Santa Clara County Public Defender as Amici Curiae on behalf of Defendant and Appellant.

Phillips Black and John Mills for Hadar Aviram and Gerald Uelman as Amici Curiae on behalf of Defendant and Appellant.

Shilpi Agarwal, Summer Lacey and Brian W. Stull for American Civil Liberties Union, American Civil Liberties Union Foundation of Northern California, American Civil Liberties Union Foundation of

Southern California and American Civil Liberties Union Foundation as Amici Curiae on behalf of Defendant and Appellant.

U.C. Berkeley School of Law, Elisabeth Semel and Erwin Chemerinsky for Governor Gavin Newsom as Amicus Curiae on behalf of Defendant and Appellant.

Keker, Van Nest & Peters, Steven A. Hirsch, Jo W. Golub and Jason George for Vicente Benavides Figueroa and Manuel Lopez as Amici Curiae on behalf of Defendant and Appellant.

Arnold & Porter Kaye Scholer and Steven L. Mayer for George Gascón; Natasha Minsker for Gil Garcetti; Diana Becton, District Attorney (Contra Costa), Chesa Boudin, District Attorney (San Francisco), Jeffrey F. Rosen, District Attorney (Santa Clara), and Tori Verber Salazar, District Attorney (San Joaquin), as Amici Curiae on behalf of Defendant and Appellant.

Kamala D. Harris, Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, James William Bilderback II, Assistant Attorney General, Dana M. Ali, Jaime L. Fuster and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

Kent S. Scheidegger and Kymberlee C. Stapleton for Criminal Justice Legal Foundation as Amicus Curiae on behalf of Plaintiff and Respondent.

Mark Zahner, Robert P. Brown, Chief Deputy District Attorney and Philip P. Stemler, Deputy District Attorney, for California District Attorneys Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Hogan Lovells US, Christopher J. Cox, Gurtej Singh, Rupinder K. Garcha, William M. Regan, Allison M. Wuertz, Daniel J. Petrokas and Peter W. Bautz for Janet C. Hoeffel, Rory K. Little, Emad H. Atiq and James Q. Whitman as Amici Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Elias Batchelder
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA 94607
(510) 267-3300

John Mills
Phillips Black, Inc.
1721 Broadway, Suite 201
Oakland, CA 94612
(888) 532-0897

Dana M. Ali
Deputy Attorney General
300 S. Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6067